[44 NYS3d 417]

JEANETTA STEGA, M.D., Ph.D., M.S.N., Also Known as JEANETTA MALANOWSKA-STEGA, Respondent, et al., Plaintiff, v NEW YORK DOWNTOWN HOSPITAL et al., Appellants, et al., Defendants.

First Department, January 10, 2017

22

### APPEARANCES OF COUNSEL

*Nixon Peabody LLP*, Jericho (*Christopher J. Porzio* and *Christopher G. Gegwich* of counsel), for appellants.

*Beranbaum Menken LLP*, New York City (*John A. Beranbaum* and *Jason J. Rozger* of counsel), for respondent.

### OPINION OF THE COURT

SAXE, J.

The statements that form the basis of the defamation claim at issue here were made to a U.S. Food and Drug Administration (FDA) investigator in the course of an investigation. In fact, that investigation was prompted by a complaint made by plaintiffs after defendant hospital terminated their employment, in which they expressed concern that the patients in research protocols being overseen by the hospital's Institutional Review Board (IRB) might be treated improperly. The particular research protocol at the heart of the underlying events, which led directly to the termination of plaintiffs' employment and the premature termination of the research protocol itself, was testing a compound developed by Luminant Bio-Sciences, LLC, for the treatment of metastatic cancer. Given both the nature of an FDA investigation into the propriety of the hospital's research protocols and the importance of the unimpeded flow of thoughts and information in this investigative context, as a matter of law and public policy, statements to

such an investigator must be protected by an absolute privilege, not merely a qualified privilege. Therefore, plaintiff Stega's defamation cause of action must be dismissed.[1]

For purposes of this motion, we accept as true the events leading to this action as alleged in the complaint: plaintiff Dr. Jeanetta Stega was employed by defendant New York Downtown Hospital (NYDH) as a research scientist and, during the relevant period, as the chair of its IRB, a board comprised of a number of individuals designated by the hospital to review, approve and oversee its biomedical research involving human subjects. The work of IRBs is governed by regulations promulgated by the FDA (see generally 21 CFR part 56).

According to the complaint, in October 2011, Luminant Bio-Sciences, LLC, the manufacturer of a newly developed drug to be used to treat metastatic (stage four) cancer, retained defendant Leonard A. Farber, M.D., an oncologist in private practice, to create a research protocol and patent application for a clinical trial for the drug. According to Stega, Farber was unable to develop the protocol, even with templates provided by Stega, and requested that Stega develop the protocol.

In October 2011, Stega alleges, she spoke about the Luminant project and her plan to write the study's protocol with several NYDH officers, including Anthony Alfano, the hospital's chief operating officer, Chad Harris, its chief compliance officer, and defendant Jeffrey Menkes, its chief executive officer. She alleges that no objection was raised to her preparing the protocol for Luminant, and that Alfano, Harris and Menkes did not ask her whether she was to be compensated for this work. Stega then agreed to write the protocol and patent application, allegedly performing this work on weekends and at night, so as not to interfere with her duties at the IRB. In about November 2011, before the proposed study was presented to the IRB, Luminant paid Stega $50,000 for this work.

Farber remained the study's principal investigator (PI), and in November 2011, he applied to the hospital's IRB for approval of the Luminant study. Stega alleges that she recused herself from the IRB's deliberations and voting on the project, since she had written the protocol and patent application, but she remained at the IRB meeting to answer questions about the Luminant study, allegedly in compliance with FDA regula-

---

1. Coplaintiff Tzall's claims were dismissed, and that dismissal is not at issue on this appeal.

tions. The IRB approved the application for the Luminant study.

Farber then commenced the clinical trial with stage four cancer patients, at his private office. Plaintiff alleges that Farber ran into financial problems or other difficulties, and complained to Luminant that he was not receiving enough money to run the study and needed more people. In December 2011, Farber requested that Stega take over the study, but she declined; then Luminant itself asked Stega to take over the study, and she declined.

On December 16, 2011, after Stega rejected demands from Farber that she turn over to him money she had received from Luminant, Farber advised Stega that he was leaving the study. He texted her the following: "The money you arranged for yourself was what I had negotiated to keep my practice going. I cannot do it for nothing. You are going to need to find a new PI and change the IRB. I am done with it." According to the complaint, Farber failed to make alternative treatment plans for the patients in the Luminant study, so Stega requested that NYDH treat those patients at its facility, and it agreed to do so over the Christmas holiday. Stega oversaw the patients in the study during that period without compensation.

Luminant then requested that NYDH take over the study. However, in the process of giving consideration to Luminant's proposal, in January 2012, Alfano asked Stega if she had been paid by Luminant; she replied that she had, after she had complied with the hospital's conflict of interest policy by informing him, Menkes, and Harris of the work, and by working on her own time. On or about January 25, 2012, Stega was called to Menkes's office, and, in the presence of Alfano and defendant Stephen G. Friedman, M.D., NYDH's acting chief medical officer, Menkes accused Stega of stealing money paid by sponsors that rightly belonged to the hospital.[2] Stega was placed on administrative leave pending an investigation of her conduct.

After performing the investigation, NYDH's counsel concluded that Stega had a conflict of interest arising from her role as chairperson of the IRB when the IRB considered the

---

2. According to Stega, the actions against her by NYDH and its executive officers were prompted by Leonard Farber, who is a friend of Menkes. She alleges that in early January 2012, after Farber notified her, Luminant, and the IRB that he wanted to resume his role as PI for the study, and Stega informed him that it was no longer his, Farber threatened to "punish Stega and destroy the study."

Luminant study. Stega's employment was terminated, along with that of plaintiff Wesley Tzall, M.D., NYDH's director of nuclear cardiology, who had been serving as vice chair of the IRB.

On March 6, 2012, Stega and Tzall filed a formal complaint with the FDA, expressing concerns that the patients in research protocols overseen by the IRB would not be properly supervised. In response to Stega and Tzall's complaint, the FDA commenced an investigation, during which an FDA investigator performed an onsite inspection of NYDH and met with Friedman. Friedman explained the reasons for Stega's removal from her positions at NYDH and the IRB and responded to Stega's and Tzall's complaint. He is alleged to have asserted that Stega had "channeled" funds from a research study sponsor to her own research group and that she had indicated to Farber that she could use her position on the IRB to get a patient into a study. Friedman allegedly said that all IRB approvals made while Stega was chairperson were "tainted."

Stega and Tzall brought this action. While the motion court granted defendants' CPLR 3211 motion to the extent of dismissing plaintiffs' other claims—which ruling is not challenged on appeal—it denied the branch of the motion seeking to dismiss the defamation claim as asserted by Stega. It reasoned that the alleged statements at issue here qualified only for a "common interest" qualified privilege, rather than for the protection of an absolute privilege, because the FDA investigation here had none of the indicia of a quasi-judicial proceeding.

My dissenting colleague agrees with the motion court, reasoning that the FDA investigation lacked the indicia of a quasi-judicial proceeding and safeguards such as an adversarial process or a determination reached based upon the application of law to the facts and subject to review.

I disagree, because under current case law, the complained-of statements were made in a quasi-judicial context in which an absolute privilege protects them.

Whether allegedly defamatory statements are protected by an absolute or a qualified privilege "depend[s] on the occasion and the position or status of the speaker" (*Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 208-209 [1983]).

> "The absolute privilege generally is reserved for communications made by individuals participating

in a public function, such as executive, legislative, judicial or quasi-judicial proceedings . . . to ensure that such persons' 'own personal interests— especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function' " (*Rosenberg v MetLife, Inc.*, 8 NY3d 359, 365 [2007]).

The Second Department explained the evolution of the applicable case law, which has developed so as to apply an absolute privilege in the quasi-judicial, administrative context:

"[T]he complexities of our modern society have substantially broadened the role of administrative law both in its rulemaking and adjudicative aspects. With that expansion has come a concomitant recognition by many courts that certain attributes of the judicial process have equal relevance to those administrative bodies that utilize a quasi-judicial process in the determination of individual rights, privileges or obligations" (*Allan & Allan Arts v Rosenblum*, 201 AD2d 136, 139 [2d Dept 1994], *lv denied* 85 NY2d 921 [1995], *cert denied* 516 US 914 [1995], quoting *Julien J. Studley, Inc. v Lefrak*, 50 AD2d 162, 165 [1975], *affd* 41 NY2d 881 [1977]).

"Accordingly, during the past several decades, the courts have extended the absolute privilege to a wide array of hearings held by administrative agencies, finding such hearings to be in substance judicial" (*Allan & Allan Arts*, 201 AD2d at 139-140 [internal quotation marks omitted]).

Moreover, it is not merely statements made in the administrative hearings themselves that are covered by the absolute privilege. Courts of this State have applied an absolute privilege to statements in complaint letters sent to the grievance committee of a bar association (*see Wiener v Weintraub*, 22 NY2d 330 [1968]), in a complaint letter to a division of the State Department of Labor requesting an investigation of an apprentice program (*see Stilsing Elec. v Joyce*, 113 AD2d 353, 356 [3d Dept 1985]), and in a Form U-5, which is required to be filed with the SEC when an employee at a brokerage is terminated (*see Herzfeld & Stern v Beck*, 175 AD2d 689 [1st Dept 1991], *lv dismissed* 82 NY2d 789 [1993], 89 NY2d 1064 [1997]). Indeed, recent cases clearly establish that the privilege does not only apply to statements made during a hearing before an administrative agency, but also applies to statements made

in the very beginning of an administrative agency's investigatory process, even at a preliminary stage (*see id.*; *Cicconi v McGinn, Smith & Co., Inc.*, 27 AD3d 59 [1st Dept 2005], *lv dismissed* 6 NY3d 807 [2006]).

In *Cicconi v McGinn, Smith*, this Court had occasion to carefully reconsider the application of the absolute privilege to statements made on the required termination notice form (Form U-5) filed by a National Association of Securities Dealers (NASD) employer about a terminated employee. In the earlier case, *Herzfeld & Stern v Beck* (175 AD2d 689 [1991]), when we applied the absolute privilege, we particularly pointed out that in the administrative context, "the absolute privilege attaches not only to the hearing stage, but to every step of the proceeding in question even if it is preliminary and/or investigatory and irrespective of whether formal charges are ever presented" (*id.* at 691). In *Cicconi* we were asked to overrule or limit that holding. We declined to do so, specifically reaffirming the aspect of *Herzfeld* holding that an allegedly defamatory statement on a Form U-5 could properly be said to have been made in a quasi-judicial proceeding, even where no investigation or adversarial hearing followed the filing of the form (27 AD3d at 62-63).

We had emphasized in *Herzfeld* that the New York Stock Exchange Department of Enforcement

"is authorized to inquire into whether one of its members or an employee thereof should be disciplined for violating a particular section of the law or pertinent rule or regulation, a process which is adversarial in nature and affords the subject of the investigation due process protections (*see,* 15 USC § 78f), including the right to appeal (15 USC § 78s [d])" (175 AD2d at 691).

In *Cicconi*, we added that public policy supports the use of an absolute privilege, since

"[b]y assuring brokerage firms that they will not be liable in tort for statements in their mandatory U-5 filings, we avoid the possibility that they will hesitate to clearly state the exact grounds for an employee's termination. Only by clear descriptions of questionable conduct by brokers can we best ensure that any future employers and customers have notice of any such conduct in their interactions with those brokers" (27 AD3d at 63).

Thereafter, the Court of Appeals came to the same conclusion in *Rosenberg v MetLife, Inc.* (8 NY3d 359 [2007], *supra*), holding that an absolute privilege must be applied to statements made by an employer about a terminated employee on an NASD employee termination notice. It explained that NASD is a quasi-governmental entity with authority to enforce the requirements of the Securities Exchange Act, and that Form U-5 plays a significant role in the agency's self-regulatory process (*id.* at 366-367).

The statements at issue here were made to an FDA investigator looking into accusations that IRB protocols at NYDH might not be properly handled. The FDA is an administrative agency of the federal government, charged with many responsibilities, including ensuring that new drug trials are handled properly. The complicated regulatory scheme for oversight by the FDA over the operation of IRBs in conducting new drug protocols, controlled by 21 CFR part 56, includes provision for procedures where an FDA investigator observes apparent noncompliance with these regulations in the operation of an IRB. Under these regulations, the IRB and parent institution are informed of those observations, and a response describing the corrective actions to be taken is required (*see* 21 CFR 56.120 [a]). If it is determined that the IRB or the institution has failed to take adequate steps to correct the noncompliance, and the FDA Commissioner determines that this noncompliance may justify the disqualification of the IRB or of the parent institution, "the Commissioner will institute proceedings in accordance with the requirements for a regulatory hearing set forth in part 16" (21 CFR 56.121 [a]). Of course, the regulatory scheme explicitly provides for court review of final administrative actions taken by the Commissioner (*see* 21 CFR 10.45 [a]).

It is therefore clear that the procedures created by these regulations of IRBs, which include the possibilities of an adversarial regulatory hearing before the FDA (*see* 21 CFR 56.121 [a]) and subsequent judicial review (*see* 21 CFR 10.45), qualify as a quasi-judicial process by an administrative agency, as contemplated by *Rosenberg* and *Herzfeld*. Like the NASD considered by the Court of Appeals in *Rosenberg* (8 NY3d at 366), the FDA "is a quasi-governmental entity [with] authority to enforce the requirements of [law]," and the agency's initial investigation into a complaint against an IRB is part of its execution of its responsibility for oversight and regulation of new drug testing. Therefore, statements made to an investiga-

tor in the course of the initial investigation by the FDA into the hospital's IRB are protected by an absolute privilege.

There is no merit in my colleague's suggestion that because such an FDA hearing would involve the IRB rather than Stega personally, the absolute privilege protecting statements made in the course of that preliminary investigation would not protect the speakers in a defamation claim brought against them by Stega. It is not germane that it is Stega who is asserting the defamation claim; the statements given to the investigator are subject to an absolute privilege, period.

It is also simply irrelevant who initiated the FDA's investigation by making a complaint to the FDA. The FDA had the authority and responsibility to commence an inquiry with regard to the proper functioning of the hospital's IRB, and, depending on what the investigator uncovered, that initial inquiry could have ultimately led to a regulatory hearing before the FDA. Therefore, when that investigator inquired of hospital administrators about the circumstances of Stega's termination and the drug protocol underlying it, that inquiry was part and parcel of the agency's process, and answers provided by a hospital administrator should be subject to the same absolute privilege as that which attaches to a complaint initiating an SEC investigation.

Furthermore, there is a strong public interest in ensuring that those with information about research protocols for newly developed drugs are encouraged to speak fully and candidly, without any need for self-censorship.

The case of *Toker v Pollak* (44 NY2d 211 [1978]), relied on by my dissenting colleague as controlling in this case, does not require a different result. That case concerned oral and written statements by defendant Henry Stern, then a deputy commissioner in the City Department of Consumer Affairs, to a representative of the Mayor's Committee on the Judiciary, a representative of the Department of Investigation, and an Assistant District Attorney. In each of those statements, Stern in effect said that he had been told by defendant Pollak, the attorney who had represented Stern's mother in a personal injury case against New York City, that Pollak had paid a bribe to plaintiff Toker, the Assistant Corporation Counsel representing the City, in order to settle Stern's mother's case. Toker then sued both Stern and Pollak (although the Court of Appeals' decision discussed only the defamation claims against Stern). The Court held that Stern's oral and written statements to the Depart-

ment of Investigation and the District Attorney were afforded only a qualified privilege (*see* 44 NY2d at 221).

In so holding, the Court relied on its previous ruling in *Pecue v West* (233 NY 316 [1922]), which held that absolute immunity does not attach to a complaint or information given to a District Attorney concerning the alleged commission of a crime. The Court in *Toker* also elaborated on the general rule (at the time) that absolute immunity had only been granted to "individuals participating in a public function, such as judicial, legislative, or executive proceedings" (44 NY2d at 219 [citations omitted]), and noted that in *Pecue v West* the Court had said that absolute immunity "applies only to a proceeding in court or one before an officer having attributes similar to a court" (*Toker*, 44 NY2d at 219, quoting *Pecue*, 233 NY at 321). The discussion in *Toker* mentioned some of the "quasi-judicial" administrative contexts in which statements have been afforded an absolute immunity (*see* 44 NY2d at 222), but emphasized that in each of its examples, a hearing was held.

However, the developing law since *Toker* has broadened the application of absolute privilege in the "quasi-judicial" context. The Court of Appeals' more recent decision in *Rosenberg* (8 NY3d 359) established that a statement made in a preliminary form to a government agency may be entitled to an absolute privilege, even where no further investigation, hearing, or any other processes are conducted by the agency as a result of that statement. This Court's decisions in *Cicconi* (27 AD3d 59) and *Herzfeld* (175 AD2d 689) elaborate on that expansion from earlier, narrower rulings such as *Toker*. The law as it currently stands no longer limits the application of absolute immunity to statements made in the context of administrative hearings.

Therefore, the allegedly defamatory statements here must be protected by an absolute privilege, and, consequently, it is irrelevant whether they were non-actionable opinion or statements of fact reasonably susceptible of a defamatory connotation.

Accordingly, the order of the Supreme Court, New York County (Debra A. James, J.), entered September 17, 2014, to the extent it denied the motion of defendants New York Downtown Hospital and Stephen G. Friedman, M.D. to dismiss plaintiff Stega's defamation cause of action as against them, should be reversed, on the law, and the motion granted. The Clerk is directed to enter judgment dismissing the complaint as against said defendants.

KAPNICK, J. (dissenting). I respectfully dissent from the majority's opinion, because I believe that the alleged defamatory statements to the U.S. Food and Drug Administration (FDA) were not protected by an absolute privilege, but rather by a qualified privilege, and thus I would affirm the motion court's order.

This action stems from the February 2012 termination of plaintiffs Jeanetta Stega, Ph.D., M.S.N. (Stega or plaintiff), and Wesley Tzall, M.D.,[1] from their positions with defendant New York Downtown Hospital (NYDH), now the New York and Presbyterian Hospital.

On January 27, 2012, Jeffrey Menkes, NYDH's chief executive officer, placed Stega on administrative leave pending an investigation of her conduct. Between January 27 and February 2, 2012, NYDH's outside counsel performed an allegedly flawed investigation. According to plaintiff, NYDH wrongly concluded that she had a conflict of interest arising from her role as chairperson of its Institutional Review Board (IRB) when the IRB considered the Luminant study. On February 2, 2012, Anthony Alfano, NYDH's chief operating officer, terminated her employment in the presence of Stephen G. Friedman, M.D., NYDH's acting chief medical officer, and Chad Harris, NYDH's chief compliance officer. On March 6, 2012, Stega and Tzall, who was also terminated from the IRB, filed a formal complaint with the FDA, because they were concerned that the patients in research protocols overseen by the IRB would not be properly supervised.

On May 22, 2012, in response to Stega and Tzall's complaint, and as part of the FDA's investigation, an FDA investigator performed an onsite inspection of NYDH, and met with Dr. Friedman, who explained the reasons for Stega's termination.

In particular, Stega alleges in this action, Dr. Friedman informed the FDA inspector that (1) "Stega had created the Stega Research Group, using her home address, and that funds from the sponsor for the Luminant study were 'channeled to the Stega Research Group' "; (2) "Stega had requested of Farber, the then PI for the Luminant study, to add a patient with prostate cancer to the Luminant study"; (3) when Farber told Stega that the IRB would not approve bringing in that patient, "according to Farber, Stega said: 'I am the IRB and I want the patient entered' "; (4) "[A]ll of the IRB's approvals of studies

---

1. In the order appealed from, the motion court dismissed all claims asserted by Tzall, and he has not taken an appeal.

when [Stega] was Chairperson were 'tainted' "; and (5) "therefore, the Hospital had removed Stega as Chair, Tzall as Vice Chairman of the IRB, and any IRB member who had direct contact with Stega," and, "[b]ecause the IRB officers and members were tainted," Dr. Friedman "wanted to disband the Hospital's IRB."

Stega further alleges that Dr. Friedman's slanderous statements to the FDA inspector were then republished in the FDA's "Establishment Inspection Report," which was sent to CEO Menkes with a cover letter, and received August 16, 2012.

The complaint, as relevant to this appeal, alleges that Dr. Friedman's statements during the FDA investigation were false, made with malice, and were defamatory per se, because they tended to injure Stega in her profession and as a research scientist who works closely with the FDA.

NYDH's motion to dismiss the defamation claim was premised primarily on the contention that Dr. Friedman's statements to the FDA investigator are protected by an absolute privilege, since they were made in the course of a quasi-judicial proceeding. NYDH alternatively argued that Dr. Friedman's statements were protected by a qualified privilege applicable to communications between people with a common interest or duty in the subject matter. Plaintiff essentially acknowledged that point, and the court denied the motion, holding that a claim of qualified privilege is to be raised as an affirmative defense and that it was premature to consider it on a motion to dismiss.[2] The motion court also found that the complaint's allegations of defamation were sufficiently specific to satisfy pleading requirements.

On appeal, defendants argue that the absolute privilege afforded to quasi-judicial proceedings applies to the FDA investigation, and immunizes Dr. Friedman's statements. Alternatively, defendants argue that the challenged statements either are true or are protected opinion.

Plaintiff argues that the FDA investigation was not a quasi-judicial proceeding, and thus no absolute privilege applies, and that, moreover, the statements made by Dr. Friedman were defamatory, and thus Dr. Friedman and NYDH are liable for their publication.

"[S]tatements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged so long as they are

---

**2.** It is not disputed on appeal that the defamatory statements are at least protected by a qualified privilege.

material and pertinent to the questions involved" (*Herzfeld & Stern v Beck*, 175 AD2d 689, 691 [1st Dept 1991], *lv dismissed* 82 NY2d 789 [1993], 89 NY2d 1064 [1997]). "As a matter of policy, the courts confine absolute privilege to a very few situations" (*Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 210 [1983]). The absolute privilege affords a speaker or writer immunity from liability for an otherwise defamatory statement to which the privilege applies, regardless of the motive with which the statement was made (*id.* at 208-209).

> "This immunity . . . has been granted only to those individuals participating in a public function, such as judicial, legislative, or executive proceedings . . . [and] is designed to ensure that their own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function" (*Toker v Pollak*, 44 NY2d 211, 219 [1978] [citations omitted]).

When applicable, the absolute privilege attaches not only to the hearing stage, but also to preliminary or investigative stages of the process (*Rosenberg v MetLife, Inc.*, 8 NY3d 359, 365 [2007], citing *Wiener v Weintraub*, 22 NY2d 330, 331 [1968]).

"An administrative function is considered quasi-judicial when it is adversarial, results in a determination that derives from the application of appropriate provisions in the law to the facts and is susceptible to judicial review" (*Herzfeld & Stern v Beck*, 175 AD2d at 691).[3]

In *Herzfeld*, the Court of Appeals found that the New York Stock Exchange (NYSE) "clearly perform[ed] as a quasi-judicial body," because it had established

> "a comprehensive system of oversight and self-regulation . . . [and was] authorized to inquire into whether one of its members or an employee thereof should be disciplined for violating a particular section of the law or pertinent rule or regulation, a process which is adversarial in nature and affords

---

3. The majority's opinion appears to be focused on the fact that statements made outside the context of an administrative hearing may still qualify for the application of absolute privilege. I do not dispute this, and therefore find most of the majority's opinion to be superfluous. Certain quasi-judicial elements must be present before the analysis even considers the stage at which the subject statements were made.

the subject of the investigation due process protec-
tions, including the right to appeal" (*id*. [citations
omitted]).

Similarly, in *Rosenberg*, the Court of Appeals found that the
National Association of Securities Dealers (NASD), which is a
self-regulatory organization, qualifies as a quasi-judicial body,
and, as a result, statements made by an employer on an NASD
employee termination (U-5) notice are protected by an absolute
privilege (8 NY3d at 366, 368). Importantly, "NASD disciplin-
ary determinations are subject to SEC and judicial review" (*id*.
at 367).

On the other hand, "a statement is subject to a qualified
privilege when it is fairly made by a person in the discharge of
some public or private duty, legal or moral, or in the conduct of
his [or her] own affairs, in a matter where his [or her] interest
is concerned" (*Rosenberg*, 8 NY3d at 365 [internal quotation
marks omitted]). If the privilege is qualified, "it can be lost by
plaintiff's proof that defendant acted out of malice" (*Park Knoll
Assoc.*, 59 NY2d at 209).

In *Toker*, the Court of Appeals held that an alleged defama-
tory statement made to the New York City Department of
Investigation (DOI) concerning plaintiff, who was seeking ap-
pointment to the Criminal Court, was only afforded a qualified
privilege because, while the DOI could subpoena witnesses, it
did not conduct a quasi-judicial hearing at which the plaintiff
could challenge the defendant's allegations. Nor did it appear
that the DOI was "empowered, based upon its findings, to grant
any tangible form of relief reviewable on appeal in the courts,"
and, therefore, the DOI's proceeding "lacked all of the safe-
guards traditionally associated with a quasi-judicial proceed-
ing" (*Toker*, 44 NY2d at 222).

Here, as in *Toker*, the safeguards attendant to a quasi-
judicial proceeding are lacking. The alleged defamatory state-
ments were made to an FDA investigator charged with
investigating complaints that the patients in research protocols
overseen by the IRB were not being properly supervised. De-
fendants accurately argue that the FDA's investigation could
lead to a hearing on whether the IRB would be disqualified;
however, such a hearing would ultimately involve the IRB and
NYDH, but not Stega. While the FDA may be an administra-
tive agency of the federal government, it does not perform as a
quasi-judicial body like the NYSE, which affords the *subject of
the investigation* due process protections, including the right to

appeal (*Herzfeld*, 175 AD2d at 691), or the NASD, whose disciplinary determinations are subject to SEC and judicial review (*Rosenberg*, 8 NY3d at 367). Further, while the FDA regulatory scheme (*see* 21 CFR 10.45) provides for subsequent judicial review, it does not afford Stega, the subject of the investigation, due process protections. Therefore, regardless of the nature of the FDA's proceeding, it would not be adversarial to Stega and would not provide a forum for her to challenge the alleged defamatory statements.

Moreover, as relied upon in applying absolute privilege in NASD U-5 termination cases, it is "significant that there are remedies available to an employee who disputes the employer's statements" (*Cicconi v McGinn, Smith & Co., Inc.*, 27 AD3d 59, 63 [1st Dept 2005], *lv dismissed* 6 NY3d 807 [2006]); specifically, an "arbitration proceeding or court action to expunge any alleged defamatory language" (*Rosenberg*, 8 NY3d at 368). No such remedy is available to Stega if the absolute privilege is applied here. Additionally, a finding of qualified privilege offers ample protection to the speaker, because malice must be proven, and, as with any defamation claim, truth is a complete defense. While I acknowledge the public importance of FDA investigations into potential misconduct in clinical trials such as the one conducted in this case, I do not find any policy reasons for concluding that this qualifies such an investigation as one of the "very few situations" (*Park Knoll Assoc.*, 59 NY2d at 210) in which speakers should be afforded unlimited freedom of speech, without inquiry into malice. Here, as in *Toker*, "[a] qualified privilege is sufficient to foster the public purpose of encouraging citizens to come forth with information concerning [potentially] criminal [or otherwise inappropriate] activity . . . [and] [t]he protection afforded by a qualified privilege should not be cavalierly dismissed as inadequate" (44 NY2d at 221).

Notwithstanding defendants' arguments and the majority's statements to the contrary, the Court of Appeals' holding in *Rosenberg*, and our rulings in *Cicconi* and *Herzfeld*, that the absolute privilege attaches to defamatory statements made in U-5 termination notices, have not expanded the application of absolute privilege so far as to encompass the scenario found here, where the requisite attributes of a quasi-judicial proceeding are not present.

Accordingly, I would find that the absolute privilege does not apply under the circumstances of this case.

Because I find that absolute privilege does not attach here, I will also address the defendants' alternative argument that the complaint should be dismissed because the alleged defamatory statements either are true or are protected opinion. The elements of defamation are "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, . . . caus[ing] special harm or constitut[ing] defamation per se" (*Dillon v City of New York*, 261 AD2d 34, 38 [1st Dept 1999]). When a qualified privilege applies, the statements are protected unless made with malice, meaning either "spite or ill will," or "reckless disregard of whether [they were] false or not" (*Liberman v Gelstein*, 80 NY2d 429, 437-438 [1992] [internal quotation marks omitted]; *Frechtman v Gutterman*, 115 AD3d 102, 107-108 [1st Dept 2014]).

In determining the sufficiency of a defamation pleading, the Court considers "whether the contested statements are reasonably susceptible of a defamatory connotation" (*Davis v Boeheim*, 24 NY3d 262, 268 [2014], quoting *Armstrong v Simon & Schuster*, 85 NY2d 373, 380 [1995]). "If, upon any reasonable view of the stated facts, plaintiff would be entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of action" (*Silsdorf v Levine*, 59 NY2d 8, 12 [1983], *cert denied* 464 US 831 [1983]).

In my opinion, the complaint adequately pleads that Dr. Friedman made false statements that are " 'reasonably susceptible of a defamatory connotation' " (*Davis*, 24 NY3d at 268) and the motion court correctly found that the alleged defamatory statements connote that Stega misappropriated funds and improperly attempted to interfere with a clinical study, and that these statements would disparage Stega in her profession. Although the FDA report of the investigation indicated that Dr. Friedman said that he "felt" that the IRB was "tainted," that does not render the statement a protected opinion (*see Mann v Abel*, 10 NY3d 271 [2008], *cert denied* 555 US 1170 [2009]). Since Dr. Friedman was the acting chief medical officer, his words carried authority when speaking about the IRB, and the context suggests to the average reader that his statements were based on facts (*see Davis*, 24 NY3d at 273).

Tom, J.P., and Andrias, J., concur with Saxe, J.; Kapnick, J., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered September 17, 2014, reversed, on the law, and the motion granted. The

Clerk is directed to enter judgment dismissing the complaint as against said defendants.