Stega v New York Downtown Hosp. (2018 NY Slip Op 04687)

Stega v New York Downtown Hosp.

2018 NY Slip Op 04687 [31 NY3d 661]

June 27, 2018

Fahey, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, October 3, 2018

[*1]

Jeanetta Stega, M.D., Ph.D., M.S.N., Also Known as Jeanetta Malanowska-Stega, Appellant, et al., Plaintiff,
v
New York Downtown Hospital et al., Respondents, et al., Defendants.

Argued June 6, 2018; decided June 27, 2018

Stega v New York Downtown Hosp., 148 AD3d 21, reversed.

{**31 NY3d at 664} OPINION OF THE COURT

Fahey, J.

This Court's decision in Rosenberg v MetLife, Inc. (8 NY3d 359 [2007]) does not shield statements, made in an administrative proceeding, that defame a person who has no recourse to challenge the accusations. The absolute privilege against defamation applied to communications in certain administrative proceedings is not a license to destroy a person's character by means of false, defamatory statements.
Our summary of the facts is drawn from plaintiff's complaint, the allegations of which we must accept as true at this stage of the litigation on a motion to dismiss. Plaintiff, Dr. Jeanetta Stega, is a medical scientist who has specialized in gynecological and oncological research. An employee of defendant New York Downtown Hospital, plaintiff became Vice-President of Research and Chairperson of the hospital's Institutional Review Board (IRB) in 2009. The IRB oversaw clinical trials, involving human subjects, of products regulated by the Food and Drug Administration (FDA).[FN1]
In 2011, defendant Dr. Leonard A. Farber, an oncologist in private practice who had medical staff privileges at Downtown Hospital, entered into an agreement with Luminant Bio-Sciences, LLC to conduct a clinical trial of a compound that Luminant had developed to treat patients with metastatic cancer. Farber asked plaintiff to assist him in developing preparatory materials for the study, including a protocol and a patent application. Plaintiff advised defendant Jeffrey Menkes, Downtown Hospital's President and Chief Executive Officer,{**31 NY3d at 665} and other hospital officials about the Luminant project, and that the first phase of the study was to be at Farber's office, followed by a larger clinical trial at Downtown Hospital. Plaintiff also told the officials that she would write the protocol and patent application for the study. Downtown Hospital raised no objections.
Working after-hours, plaintiff drafted the preliminary documents for the Luminant study, for which Luminant paid her $50,000. Plaintiff opened a bank account in the name "Stega Research Group" and, as she phrases it in her complaint, she "deposited the $50,000 . . . in the Stega Research Group . . . account."
When Farber applied to Downtown Hospital's IRB for approval of the Luminant study, plaintiff recused herself from the board's deliberations and voting, but she answered other IRB members' questions about the study. The IRB approved the trial.
Conflicts arose between Farber and Luminant, and the clinical study soon went awry. In a telephone conversation with plaintiff, Farber allegedly threatened to destroy the trial and punish Luminant. Tensions between Farber and plaintiff intensified, and Farber threatened plaintiff with retribution too. It was at this point, according to plaintiff, that Farber told Menkes that plaintiff had stolen the Luminant study from him, that she had taken funds that did not belong to her, and that the drug compound was toxic and unsafe for patients.
Menkes and defendant Dr. Stephen G. Friedman, Downtown Hospital's Acting Chief Medical Officer, met with plaintiff and accused her of taking funds that belonged to the hospital. They also charged her with engaging in a conflict of interest by seeking approval from the IRB for the Luminant study despite being a member of that board. Plaintiff was placed on administrative leave. Following an investigation, Downtown Hospital officials concluded that plaintiff had violated the hospital's conflict of interest policy and had improperly taken money from Luminant "on the side." In February 2012, plaintiff's employment was terminated. Plaintiff and the IRB's Vice Chairperson were both removed from the board, which Downtown Hospital sought to disband.
In March 2012, plaintiff and the IRB's Vice Chairperson submitted a complaint to the FDA, which monitors the compliance of IRBs with its regulations. They expressed concerns{**31 NY3d at 666} regarding their ouster and about whether the patients in research trials overseen by Downtown Hospital's IRB would be properly supervised. FDA investigators promptly interviewed plaintiff and the Vice Chair. In May, following appropriate notice, the agency conducted an on-site inspection of the IRB. An FDA inspector spoke with Friedman and other hospital administrators and reviewed the IRB's membership, policies, and procedures, as well as trial participants' informed consents and selected studies overseen by the IRB.
It was in this context that Friedman, during a May 22, 2012 meeting with an FDA inspector, stated that plaintiff had "channeled" Luminant's funds to a "Stega Research Group" at her home address. Friedman also told the inspector that plaintiff had requested that Farber add a patient with prostate cancer to the study, which otherwise had only lung cancer patients as subjects, and, when Farber refused, plaintiff had replied, "I am the IRB and I want the patient entered." Friedman informed the inspector that, in addition to terminating plaintiff, he had removed plaintiff and the Vice Chairperson from the IRB, and wished to disband the board, in part because it was "tainted" as a result of plaintiff's involvement.
The FDA subsequently released an establishment inspection report (EIR) to Downtown Hospital, outlining instances, unrelated to plaintiff's conduct, of procedural noncompliance by the IRB with FDA regulations. The EIR did not expressly discuss whether Downtown Hospital had properly terminated plaintiff's employment and removed [*2]her as IRB Chairperson, but noted that the "[i]nspection found certain improprieties documented by the hospital's management resulting in the removal of Dr. Stega."
Friedman's statements about plaintiff were published in the EIR, as follows:
"On May 22, 2012 a discussion with Dr. Steven Friedman was held at which time he discussed the reasons for the removal of Dr. J[e]anetta Stega from her positions at New York Downtown Hospital and the IRB. According to Dr. Friedman, Dr. Stega created the Stega Research Group using her home address. Funds for study LF 11-11 (Dr. Leonard Farber, [Principal Investigator]) from the sponsor [were] channeled to this group. Further Dr. Farber did not want to enter a prostate cancer patient onto{**31 NY3d at 667} this lung cancer protocol when Dr. Stega requested him to do so. Dr. Farber reportedly stated that the IRB would not approve this patient and Dr. Stega reportedly stated that she is the IRB and wanted the patient entered. . . .
"Dr. Stega was subsequently fired. Dr. Friedman felt that the IRB and their approvals were tainted and therefore the hospital removed Dr. Stega and . . . any members that had direct contact with Dr. Stega. This is one of the reasons Dr. Friedman wants to disband the IRB."
After the EIR came to her attention, plaintiff commenced this defamation action against Downtown Hospital, Friedman, Menkes, Farber, and others. Plaintiff asserts that her professional reputation has been significantly damaged by the publication of false, defamatory statements about her made by Friedman to the FDA inspectors, insofar as they undermine her standing with the FDA and her livelihood as a research scientist.
In lieu of an answer, the defendants moved to dismiss the complaint under CPLR 3211 (a) (7). As relevant here, defendants Downtown Hospital and Friedman contended that Friedman's statements are protected by an absolute privilege, and, in the alternative, that the complaint should be dismissed because the statements are either true on the face of the complaint or, in the instance of the remark that the IRB was "tainted," an expression of pure opinion.
Although Supreme Court granted the defendants' motion to dismiss in other respects, the court allowed plaintiff's defamation claim against Downtown Hospital and Friedman to survive, and severed the defamation claim against those defendants. Supreme Court reasoned that the statements at issue were not shielded by an absolute privilege, because the FDA's investigation had none of the indicia of a quasi-judicial proceeding, and in particular lacked safeguards such as an adversarial procedure or a determination subject to review. Plaintiff was not a "participant[ ] in the investigation, which was not an adversarial process; nor could [she] challenge the statements made about [her]. That it was an official governmental investigation conducted by a regulatory agency does not by itself make it a quasi-judicial function" (2014 NY Slip Op 32409[U], *18 [Sup Ct, NY County 2014]). As to whether the{**31 NY3d at 668} statements were instead subject to a qualified or conditional privilege, Supreme Court declared that issue "premature on a motion to dismiss" (id. at *19).
Supreme Court further rejected the defendants' contentions about the content of Friedman's statements. The court ruled that Friedman's "statement that Stega 'channeled' money is not, at this stage, demonstrably true" (id. at *22). With respect to Friedman's remark that the IRB was tainted while plaintiff was its chair, Supreme Court concluded that the statement "would lead the average person to believe that the statement was proffered for its accuracy as a matter of fact, and had a readily understood meaning and can be shown to be true or false" (id. at *23-24 [internal quotation marks, citations, and square brackets omitted]).
Defendants Downtown Hospital and Friedman appealed from Supreme Court's order, insofar as it denied their motion to dismiss plaintiff's defamation cause of action against them. Plaintiff did not appeal.
The Appellate Division reversed Supreme Court's order, to the extent appealed from, granted defendants' motion, and directed the entry of judgment dismissing the complaint against them. The Appellate Division held that[*3]"the complained-of statements were made in a quasi-judicial context in which an absolute privilege protects them" (148 AD3d 21, 25 [1st Dept 2017]). The Court, citing our recent opinion in Rosenberg (8 NY3d 359), reasoned that the FDA's "procedures . . . , which include the possibilities of an adversarial regulatory hearing before the FDA (see 21 CFR 56.121 [a]) and subsequent judicial review (see 21 CFR 10.45), qualify as a quasi-judicial process by an administrative agency" (148 AD3d at 28).
A single Justice dissented, principally on the basis of this Court's decision in Toker v Pollak (44 NY2d 211 [1978]). The dissenting Justice would have held that the absolute privilege does not apply because "regardless of the nature of the FDA's proceeding, it would not be adversarial to Stega and would not provide a forum for her to challenge the alleged defamatory statements" (148 AD3d 21, 35 [Kapnick, J., dissenting]). The dissent also discussed defendants' alternative challenges to the defamation suit (which the majority had no need to reach), reasoning that the alleged defamatory statements were neither true on the basis of the complaint nor protected expression of opinion (see id. at 36 [Kapnick, J., dissenting]).{**31 NY3d at 669}
The Appellate Division granted plaintiff leave to appeal, certifying the question whether its order was properly made (2017 NY Slip Op 69650[U] [1st Dept 2017]). We now reverse and answer the certified question in the negative.
The first issue is whether Friedman's statements, as published in the EIR, are protected by absolute privilege. We hold that they are not.
The broad principles of immunity in defamation law are well established.[FN2] "Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether" (Liberman v Gelstein, 80 NY2d 429, 437 [1992]). In particular, "[b]ecause the . . . social benefit in encouraging free speech or the discharge of governmental responsibility sometimes outweighs the individual's underlying right to a good reputation, the individual's right may have to yield to a privilege granted the speaker barring recovery of damages for the defamatory statements" (Park Knoll Assoc. v Schmidt, 59 NY2d 205, 208 [1983]).
Absolute privilege, which entirely immunizes an individual from liability in a defamation action, regardless of the declarant's motives, is generally reserved for communications made by "individuals participating in a public function, such as judicial, legislative, or executive proceedings. The absolute protection afforded such individuals is designed to ensure that their own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function" (Toker, 44 NY2d at 219 [citations omitted]; see also Rosenberg, 8 NY3d at 365). Thus, for example, statements uttered in the course of a judicial proceeding are absolutely privileged, "as long as such statements are material and pertinent to the questions involved" in the proceeding (Wiener v Weintraub, 22 NY2d 330, 331 [1968] [internal quotation marks omitted], quoting Marsh v Ellsworth, 50 NY 309, 311 [1872]).
On the other hand, a statement is subject to a qualified privilege when it "is fairly made by a person in the discharge of{**31 NY3d at 670} some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his [or her] interest is concerned" (Toker, 44 NY2d at 219). When subject to this form of conditional privilege, statements are protected if they were not made with "spite or ill will" or "reckless disregard of whether [they were] false or not" (Liberman, 80 NY2d at 437-438), i.e., malice. A qualified privilege "places the burden of proof on this issue [of malice] upon the plaintiff" (Toker, 44 NY2d at 219).
Whether allegedly defamatory statements are subject to an absolute or a qualified privilege "depend[s] on the occasion and the position or status of the speaker" (Park Knoll Assoc., 59 NY2d at 208-209), a complex assessment that must take into account the specific character of the proceeding in which the communication is made. We have [*4]reiterated that "[a]s a matter of policy, the courts confine absolute privilege to a very few situations" (Front, Inc. v Khalil, 24 NY3d 713, 719 [2015], quoting Park Knoll Assoc., 59 NY2d at 210; see also Stukuls v State of New York, 42 NY2d 272, 278 [1977]). Those limits are the subject of the primary dispute before us today.
In Toker (44 NY2d 211), this Court explained that "absolute immunity applies only to a proceeding in court or one before an officer having attributes similar to a court" (Toker, 44 NY2d at 219 [internal quotation marks omitted]). By way of contrasting examples, we observed that "witnesses testifying before a Grand Jury are protected by an absolute immunity," just as they would if giving testimony in court, whereas "a communication made by an individual to a law enforcement officer" is subject to a qualified privilege, not absolute immunity (Toker, 44 NY2d at 219-220). Reference was made to Wiener v Weintraub (22 NY2d 330 [1968]), in which a complaint made to a bar association grievance committee was held to be protected by absolute privilege. The Toker Court then analyzed the attributes of proceedings in which administrative bodies have exercised a function sufficiently like that of a court: "In each of these proceedings, . . . the administrative body exercised a quasi-judicial function. A hearing was held at which both parties were entitled to participate. The administrative body was empowered, based upon its findings, to take remedial action, whether it be an award of compensation, disbarment, or revocation{**31 NY3d at 671} of a license" (Toker, 44 NY2d at 222 [emphasis added]).[FN3]
Toker held that absolute privilege did not apply to statements made to the Department of Investigation of the City of New York, a law enforcement agency that investigated City employees, because "no quasi-judicial hearing at which plaintiff . . . was permitted to challenge defendant['s] . . . allegations was ever held," and the agency conducting the investigation was not "empowered . . . to grant any tangible form of relief reviewable on appeal in the courts. In sum, the proceeding . . . lacked all of the safeguards traditionally associated with a quasi-judicial proceeding" (Toker, 44 NY2d at 222). As the Court expressed the central principle underlying its ruling, "[t]o clothe with absolute immunity communications . . . [that] because of the absence of a hearing may often go unheard of, let alone challenged, by their subject—would provide an unchecked vehicle for silent but effective character assassination" (id.).
The significance of Toker is that, for absolute immunity to apply in a quasi-judicial context, the process must make available a mechanism for the party alleging defamation to challenge the allegedly false and defamatory statements. Of course, a judicial proceeding, in which absolute privilege applies, will not in itself give a defamed individual the opportunity to challenge sworn testimony if the individual is not a party to the proceeding. Yet any "character assassination" that occurs in a judicial proceeding is at least in principle subject to charges of perjury. Toker ensures that the expansion of the scope of absolute privilege, from testimony at judicial proceedings to the wide range of statements made to administrative agencies, is kept within narrow bounds: the privilege extends only if procedural safeguards enable the defamed party to contest what is said against her.
Our subsequent cases have not departed from these principles. Defendants rely primarily on Rosenberg (8 NY3d 359), where this Court held that absolute privilege applies to statements made by an employer about a terminated employee on a U-5 Form submitted to the National Association of Securities Dealers (NASD), even though the challenged statements occurred{**31 NY3d at 672} in the preliminary stage of an administrative investigation.[FN4] It is true that Rosenberg laid out certain rationales for its holding that have analogs in the case before us. The FDA is the government agency with authority to regulate IRBs (see 21 CFR 56.101 [a]), just as the NASD "is the primary regulator of the broker-dealer industry" (Rosenberg, 8 NY3d at 366). The interview of Friedman was a crucial preliminary step in the investigation of the IRB, just as the U-5 Form plays that part "in the NASD's quasi-judicial process" (id. at 367). Moreover, it is in the public interest to encourage the full disclosure of noncompliance by those [*5]charged with reviewing clinical studies involving human subjects and complete candor on the part of those whom the FDA is interviewing, and that principle resembles the point that candid responses on the NASD's forms ultimately benefit "the general investing public, which faces the potential for substantial harm if exposed to unethical brokers" (id. at 368). Significantly, however, the Rosenberg Court specifically noted that NASD's disciplinary hearings gave a terminated broker an opportunity to defend himself or herself against charges of misconduct "before a NASD hearing panel" (id. at 367), and observed in particular that "NASD disciplinary determinations are subject to SEC and judicial review" (id.). Further, the Court observed that NASD rules also provide for arbitration proceedings in which a terminated employee can seek expungement of the allegedly defamatory statements from the U-5 Form (see id. at 368). Indeed, these points were the subject of dispute between the majority in Rosenberg and the dissent, which took issue with whether Rosenberg really had "an opportunity to challenge the statements made on his Form U-5" (id. at 369 [Pigott, J., dissenting]). We are not persuaded that the Rosenberg Court departed from Toker's principles.
Was plaintiff entitled to participate, by way of a hearing or otherwise, in the FDA's review of the IRB and thereby challenge the accusations against her made by Friedman? On this point, there is little disagreement. She was not. Plaintiff insists that she did not receive notice of any stage in the FDA's investigation of the IRB. Nothing in the FDA regulations gives{**31 NY3d at 673} a third party, even one "with a direct interest" (21 CFR 56.120 [c]; 56.121 [c]) in the matter, the right to notice of an FDA report concerning IRB noncompliance (see 21 CFR 56.120 [a]) or the right to attend a "regulatory hearing" at which the IRB, as the subject of the investigation, would challenge disqualification by the FDA (21 CFR 56.121 [a]). Moreover, while the regulatory scheme provides for judicial review (see 21 CFR 10.45), defendants do not dispute plaintiff's contention that she lacks standing to seek such review of the EIR, because the proceeding was not adversarial to her. Nor do defendants allege any alternative avenues available to plaintiff to contest, before the FDA, the alleged harm to her reputation. For these reasons, Rosenberg is distinguishable.
Defendants suggest that the FDA inspection process nevertheless qualifies as quasi-judicial simply because the IRB would have the right to appear at any hearing in which it contested the allegations against it. More specifically, defendants question whether Toker stands for the proposition that a name-clearing opportunity on the part of the party claiming defamation is a prerequisite for the absolute privilege to apply. They assert that the only proposition adhered to by this Court is that the proceeding must contain the possibility of an adversarial hearing, even if not necessarily a hearing at which the party alleging defamation could challenge the statements in question. This theory, however, flies in the face of the policy rationale for insisting on an adversarial procedure, namely to prevent the absolute privilege from shielding statements published in a setting in which the defamed party may never know of the statements and, even if he or she did, would have no way to rebut them (see Toker, 44 NY2d at 222).
Defendants further insist that a qualified privilege would not be sufficient to foster the level of candor needed in the context in which the FDA is investigating IRBs, because of the fear of potential litigation, in which a speaker, as defendants see it, would be obliged to prove lack of malice. However, it is the defamation plaintiff who "would have the burden of showing that a statement is actionable because it was motivated by malice" (Rosenberg, 8 NY3d at 370; see Toker, 44 NY2d at 219), in order to negate the privilege. The defendant whose communications are subject to a qualified privilege would have no burden of showing lack of malice.
Naturally, a defamation defendant will be subject to discovery. Nevertheless, we do not believe that the imposition of{**31 NY3d at 674} qualified, rather than absolute, immunity would chill effective investigation of IRBs by the FDA.
"The protection afforded by a qualified privilege should not be cavalierly dismissed as inadequate. On the contrary, while not providing an absolute cloak of protection, a qualified privilege does provide an atmosphere in which a civic-minded citizen may, without fear, convey information . . . to the benefit of the public. Only those who act out of malice, rather than public interest, need hesitate before speaking" (Toker, 44 NY2d at 221).
That protection is adequate to encourage candor in the context before us here. Additionally, while defendants are, of course, correct that the interest in protecting human subjects in clinical trials through FDA regulation is an especially compelling one, since human lives are at stake, we believe that ensuring that hospital employees are accurate and truthful about the character and professional standing of their colleagues is an important element in the protection of human subjects. There is, of course, no inherent conflict between being candid and being accurate.
[*6]
In the alternative, defendants argue that Friedman's statement that plaintiff had "channeled" Luminant's funds to the "Stega Research Group" is not a false, defamatory statement because plaintiff's complaint reveals that it is true. Certainly, the falsity of an allegedly defamatory statement is an element of any defamation claim, but on a pre-answer motion to dismiss a defendant will prevail on this ground only if the statement's truth may be established from the complaint alone. While defendants point out that plaintiff's complaint states that she "deposited" the money in the Stega Research Group account, this does not have the same meaning as the communication that plaintiff "channeled" funds. This statement, in context, "connote[s] that Stega misappropriated funds" (148 AD3d at 36 [Kapnick, J., dissenting]) or, at the very least, that she transferred funds in a clandestine manner.
We also reject defendants' contention on this motion to dismiss that Friedman's statement that the IRB was "tainted" was a pure expression of opinion. Although "[a]n expression of pure opinion is not actionable," a "statement of opinion [that] implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, . . . is a 'mixed opinion' and is actionable" (Steinhilber v Alphonse, 68 NY2d{**31 NY3d at 675} 283, 289 [1986]). Here, Friedman's "words carried authority when speaking about the IRB, and the context suggests to the average reader that his statements were based on facts" undisclosed to the reader (148 AD3d at 36 [Kapnick, J., dissenting], citing Davis v Boeheim, 24 NY3d 262, 273 [2014]).
Finally, we note that on appeal defendants do not contest the falsity or the defamatory nature of Friedman's statement that plaintiff requested the addition of a patient with prostate cancer to the Luminant study and then told Farber "I am the IRB and I want the patient entered."
Accordingly, the order of the Appellate Division should be reversed, with costs, the CPLR 3211 motion of defendants New York Downtown Hospital and Stephen G. Friedman, M.D., insofar as it sought to dismiss the defamation claim as against them, denied, and the certified question answered in the negative.

Rivera, J. (dissenting). The majority concludes that whether an absolute privilege applies to a communication made in the course of a quasi-judicial proceeding depends on the status of the subject of the communication, rather than the forum or circumstances in which the challenged communication is made. That rule has no support in this Court's prior decisions and undermines the public policy of encouraging greater openness in communications with government officials. Therefore, I dissent.
"Public policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action" (Toker v Pollak, 44 NY2d 211, 218 [1978]). As such, the Court has recognized an absolute privilege for alleged defamatory "communications made by individuals participating in a [*7]public function, such as executive, legislative, judicial or quasi-judicial proceedings" (Rosenberg v MetLife, Inc., 8 NY3d 359, 365 [2007]). This privilege "extend[s] to preliminary or investigative stages of the process" (id., citing Wiener v Weintraub, 22 NY2d 330, 331 [1968]).
The justification for an absolute privilege in these circumstances is well known. Cloaking these communications with absolute immunity furthers the public interest in effective government by encouraging individuals to properly discharge their public function and speak candidly about matters within their knowledge without fear of even an unsuccessful civil action{**31 NY3d at 676} (see Toker, 44 NY2d at 219). The speaker's immunity, then, is best understood as a doctrinal means to a policy-based end because the absolute privilege is "for the benefit of the public, to promote the administration of justice, and only incidentally for the protection of the participants" (Park Knoll Assoc. v Schmidt, 59 NY2d 205, 209 [1983]).
Consequently, and contrary to the majority's view, the absolute privilege applied to communications made in the course of the discharge of a public function does not depend on whether the subject of the communication, i.e. the party allegedly defamed, is also the subject of an administrative proceeding or investigation. The status of the person being discussed is irrelevant; "[a]bsolute privilege is based upon the personal position or status of the speaker" (id. [emphasis added]). What matters is not the target of the communication, but whether the communication was made during the course of the speaker's participation in a public function. Here, it is undisputed that the speaker was participating in a Food and Drug Administration investigation—the preliminary stage of a potential quasi-judicial proceeding.
We have never required that the subject of a communication be a participant in the proceeding, much less that the subject have an opportunity to challenge the alleged defamatory statement within the confines of that very proceeding. Such a rule would lead to uneven application—affording protection to some individuals but not others, and cloaking communications depending on the target of the speech and not its content—and inject uncertainty about the availability of absolute immunity for those participating in these types of proceedings. The majority's rule thus undermines what the Court has identified as the animating public policy for adopting an absolute privilege in quasi-judicial proceedings (see Rosenberg, 8 NY3d at 365, citing Toker, 44 NY2d at 219).
Neither Rosenberg nor Toker stand for the proposition adopted by the majority here (majority op at 
664). The majority places unwarranted emphasis on dicta in Rosenberg that employees allegedly defamed by statements set forth in a Form U-5—an employee termination notice required by the National Association of Securities Dealers stating the reasons the employer terminated the employee—could commence an arbitration proceeding or a separate judicial action to expunge the alleged defamatory language (majority op at 
672). Without any reference, or reliance on whether the employees had some{**31 NY3d at 677} recourse within the administrative hearing, the Rosenberg Court held,
"[t]he Form U-5's compulsory nature and its role in the NASD's quasi-judicial process, together with the protection of public interests, lead us to conclude that statements made by an employer on the form should be subject to an absolute privilege. Analogously, close to 40 years ago in Wiener we determined that complaints involving attorneys should be accorded an absolute privilege because of 'the necessity of maintaining the high standards of our bar' (Wiener, 22 NY2d at 332). The regulation of registered brokers in the securities industry is of no less importance" (8 NY3d at 368).
Having reached its conclusion that absolute immunity applies in the context of an employer's statement on a Form U-5, the Rosenberg majority then sought to correct the dissent, which asserted that a Form U-5 is not intended to be part of a court proceeding and does not usually result in regulatory action (see id. at 369 [Pigott, J., dissenting]). In doing so, the majority was not setting forth an element necessary to its determination that "the compulsory Form U-5 can be viewed as a preliminary or first step in the [National Association of Securities Dealers'] quasi-judicial process" (id. at 367). Instead, the majority's response was a factual aside and not an essential part of its holding.
The Court in Toker also focused on the scope of the proceeding, which it deemed "critical" to its absolute immunity determination, and not on the subject of the alleged defamatory statements (see Toker, 44 NY2d at 220-[*8]221). To the extent the majority here reads that case to require the opportunity to challenge the alleged defamatory statements in the administrative proceeding, its approach requires that we overrule Rosenberg when there is nothing to suggest that "an extraordinary combination of factors undermines the reasoning and practical viability of our prior decision" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 23 [2016]).
Even if I accepted the majority's gloss on these cases, I would not agree with its conclusion that the opportunity to challenge alleged defamatory statements must be afforded in an administrative hearing during which the statements are made or considered (majority op at 
672). That rule contradicts language in Rosenberg that mentions remedies for defamed employees{**31 NY3d at 678} that are not part of the administrative hearing: specifically a separate arbitration proceeding or a court action.
Applying our precedent to the instant appeal, the communications made to the Institutional Review Board about plaintiff Stega are absolutely privileged. As the Appellate Division explained, "[i]t is not germane that it is Stega who is asserting the defamation claim; the statements given to the investigator are subject to an absolute privilege, period" (Stega v New York Downtown Hosp., 148 AD3d 21, 29 [1st Dept 2017]). If absolute immunity applies to a Form U-5, which impacts an employee's future employment and the public's financial investments, a fortiori it applies to statements made to a federal investigation regarding clinical trials involving human subjects and treatment of life-threatening conditions.
Judges Stein, Wilson and Feinman concur; Judge Rivera dissents in an opinion in which Judge Garcia concurs; Chief Judge DiFiore taking no part.
Order reversed, with costs, the CPLR 3211 motion of defendants New York Downtown Hospital and Stephen G. Friedman, M.D., insofar as it sought to dismiss the defamation claim as against them, denied, and certified question answered in the negative.

Footnotes

Footnote 1:"Institutional Review Board (IRB) means any board, committee, or other group formally designated by an institution to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects" (21 CFR 56.102 [g]).

Footnote 2:Although the allegedly defamatory statements were made to a federal investigator, the parties have assumed that New York, not federal, law governs the appropriate level of immunity to be afforded to Friedman. We accept, without deciding, the premise agreed to by the parties.

Footnote 3:In a grievance committee proceeding, the individual accused of wrongdoing has a right to request, and appear at, a hearing to contest the allegations (see Judiciary Law § 90 [4] [h]).

Footnote 4:"Upon termination of a registered representative, the NASD requires member firms to complete and file with the NASD a Uniform Termination Notice for Securities Industry Registration (Form U-5) within 30 days of dismissal and to provide a copy of the form to the employee" (Rosenberg, 8 NY3d at 362).