[866 NE2d 439, 834 NYS2d 494]

Chaskie J. Rosenberg, Appellant, v MetLife, Inc., et al., Respondents.

Argued February 13, 2007; decided March 29, 2007

**POINTS OF COUNSEL**

*Heller, Horowitz & Feit, P.C.,* New York City (*Maurice W. Heller, Jacob W. Heller, Allen M. Eisenberg* and *Evan R. Shusterman* of counsel), for appellant. I. According a qualified privilege to statements in the Form U-5 is consistent with New York law. (*Andrews v Gardiner,* 224 NY 440; *Toker v Pollak,* 44 NY2d 211; *Park Knoll Assoc. v Schmidt,* 59 NY2d 205; *Mihlovan v Grozavu,* 72 NY2d 506; *Shapiro v Health Ins. Plan of Greater N.Y.,* 7 NY2d 56; *Baravati v Josephthal, Lyon & Ross, Inc.,* 28 F3d 704; *Herzfeld & Stern v Beck,* 175 AD2d 689; *First Heritage Corp. v National Assn. of Sec. Dealers, Inc.,* 785 F Supp 1250; *F.N. Wolf & Co. v Bowles,* 160 Misc 2d 752; *Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59.) II. The overwhelming weight of authority favors qualified immunity. (*Fahnestock & Co., Inc. v Waltman,* 935 F2d 512; *Toker v Pollak,* 44 NY2d 211; *Acciardo v Millennium Sec. Corp.,* 83 F Supp 2d 413; *Dawson v New York Life Ins. Co.,* 135 F3d 1158; *Andrews v Prudential Sec., Inc.,* 160 F3d 304; *Glennon v Dean Witter Reynolds, Inc.,* 83 F3d 132; *Baravati v Josephthal, Lyon & Ross, Inc.,* 28 F3d 704; *Dickinson v Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 431 F Supp 2d 247; *Prudential Sec., Inc. v Dalton,* 929 F Supp 1411.)

*Proskauer Rose LLP,* Newark, New Jersey (*Steven E. Obus, Steven Yarusinsky* and *Steven H. Holinstat* of counsel), for respondents. Statements required to be made on a Form U-5 are absolutely privileged against claims of defamation. (*Herzfeld & Stern v Beck,* 175 AD2d 689; *Toker v Pollak,* 44 NY2d 211; *Wiener v Weintraub,* 22 NY2d 330; *Hessel v Goldman, Sachs & Co.,* 281 AD2d 247; *Matter of Dunn v Ladenburg Thalmann & Co.,* 259 AD2d 544; *Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59, 6 NY3d 807; *Fahnestock & Co., Inc. v Waltman,* 935 F2d 512; *Matter of Spasiano [1717 Capital Mgt. Co.],* 1 AD3d 902; *Park Knoll Assoc. v Schmidt,* 59 NY2d 205; *Andrews v Gardiner,* 224 NY 440.)

*Schlam Stone & Dolan LLP,* New York City (*David J. Katz* of counsel), for Matthew N. Murray, amicus curiae. Statements made by an employer on a National Association of Securities Dealers employee termination notice (Form U-5) should be subject to a qualified privilege in a suit for defamation.

*Zamansky & Associates, LLC,* New York City (*Jacob H. Zamansky* and *Edward H. Glenn, Jr.,* of counsel), for National Employment Lawyers Association/New York, amicus curiae. Statements in the Form U-5 should be accorded only a qualified

privilege. (*Acciardo v Millennium Sec. Corp.,* 83 F Supp 2d 413; *Baravati v Josephthal, Lyon & Ross, Inc.,* 28 F3d 704; *Herzfeld & Stern v Beck,* 175 AD2d 689; *Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59; *Toker v Pollak,* 44 NY2d 211; *Dawson v New York Life Ins. Co.,* 135 F3d 1158; *Glennon v Dean Witter Reynolds, Inc.,* 83 F3d 132.)

*Orrick, Herrington & Sutcliffe LLP,* New York City (*Michael Delikat* and *Robert S. Whitman* of counsel), for the Securities Industry and Financial Markets Association, amicus curiae. Statements on a Form U-5 should be absolutely privileged against defamation claims. (*Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59; *National Assn. of Sec. Dealers, Inc. v Securities & Exch. Commn.,* 431 F3d 803; *Boice v Unisys Corp.,* 50 F3d 1145; *Slotten v Hoffman,* 999 F2d 333; *Becker v Philco Corp.,* 372 F2d 771; *Gulati v Zuckerman,* 723 F Supp 353; *McManus v McCarthy,* 586 F Supp 302; *Blum v Campbell,* 355 F Supp 1220; *Westfall v Erwin,* 484 US 292; *Boice v Unisys Corp.,* 50 F3d 1145.)

*Liddle & Robinson, L.L.P.,* New York City (*Jeffrey L. Liddle* and *Ethan A. Brecher* of counsel), amicus curiae. I. Brokerage firms misuse Forms U-5 to harm individual executives. (*Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59, 6 NY3d 807; *Herzfeld & Stern v Beck,* 175 AD2d 689, 79 NY2d 914; *Sawtelle v Waddell & Reed,* 304 AD2d 103; *Sawtelle v Waddell & Reed, Inc.,* 21 AD3d 820, 6 NY3d 750.) II. The law of New York fully supports a qualified privilege for defamatory communications on Forms U-5. (*Toker v Pollak,* 44 NY2d 211; *Baravati v Josephthal, Lyon & Ross, Inc.,* 28 F3d 704; *Dawson v New York Life Ins. Co.,* 135 F3d 1158; *Cicconi v McGinn, Smith & Co., Inc.,* 27 AD3d 59, 6 NY3d 807; *Herzfeld & Stern v Beck,* 175 AD2d 689, 79 NY2d 914; *Liberman v Gelstein,* 80 NY2d 429; *Shapiro v Health Ins. Plan of Greater N.Y.,* 7 NY2d 56; *Purgess v Sharrock,* 33 F3d 134; *Horn v New York Times,* 100 NY2d 85; *Prudential Sec., Inc. v Dalton,* 929 F Supp 1411.) III. The National Association of Securities Dealers provides no adequate remedy for a defamed employee to clear his professional reputation. (*Prozeralik v Capital Cities Communications,* 82 NY2d 466; *Den Norske Ameriekalinje Actiesselskabet v Sun Print. & Publ. Assn.,* 226 NY 1.)

**OPINION OF THE COURT**

GRAFFEO, J.

The United States Court of Appeals for the Second Circuit

has asked us whether statements made by an employer on a National Association of Securities Dealers (NASD) employee termination notice (Form U-5) are subject to an absolute or qualified privilege in a defamation lawsuit. For the reasons that follow, we conclude that such statements are protected by an absolute privilege.

In 1997, defendant MetLife, Inc. hired plaintiff Chaskie Rosenberg to work as a financial service representative in MetLife's All-Boro agency in Brooklyn. The All-Boro office primarily serviced the local Hasidic Jewish community and a majority of the agency's employees, including plaintiff, were Hasidic Jews. MetLife audited the All-Boro agency in 1999 because of the agency's acceptance of third-party checks for the payment of premiums for life insurance policies. According to MetLife, third-party payments can be indicative of speculative insurance practices[1] and possible money-laundering activities. After a subsequent audit in 2000, MetLife closed the All-Boro agency, concluding that such practices were continuing at the agency.[2] Plaintiff and other All-Boro agency representatives were transferred to another office. In April 2003, MetLife terminated plaintiff's employment following another audit.

Upon termination of a registered representative, the NASD requires member firms to complete and file with the NASD a Uniform Termination Notice for Securities Industry Registration (Form U-5) within 30 days of dismissal and to provide a copy of the form to the employee (see NASD By-Laws, art V, § 3 [a]). The employer must explain the reasons for termination on the Form U-5. In addition, the form contains a number of disclosure questions that address whether the employee had been subject to criminal charges, customer complaints or an internal review for violating investment-related rules. If any of these inquiries is answered in the affirmative, a corresponding disclosure reporting page directs the employer to explain the nature of these allegations.[3]

---

1. Speculative insurance involves the purchase of a policy on the life of an insured as a form of investment by a third party with no insurable interest.

2. According to plaintiff, a number of the agency's policyholders relied on a Gemach, a Jewish free loan society, to help them meet their premium payments, resulting in the use of third-party checks to make premium payments.

3. The NASD stores the Form U-5 on its Central Registration Depository (CRD), an on-line registration and licensing database used by regulators throughout the securities industry to register, license and regulate securities firms and their brokers. Through one component of the CRD called "Broker-

Consistent with these requirements, MetLife prepared a Form U-5 after plaintiff's dismissal and filed it with the NASD in May 2003. The form stated the following reason for plaintiff's termination: "AN INTERNAL REVIEW DISCLOSED MR[.] ROSENBERG APPEARED TO HAVE VIOLATED COMPANY POLICIES AND PROCEDURES INVOLVING SPECULATIVE INSURANCE SALES AND POSSIBLE ACCESSORY TO MONEY LAUNDERING VIOLATIONS." MetLife also indicated that plaintiff had been under an internal review for violating investor-related rules in response to the relevant disclosure question. On the disclosure reporting page, MetLife restated this reason for termination.[4]

---

Check," the NASD allows investors to obtain certain information about individual brokers and registered securities firms. General information, such as a broker's current employer and 10 years of employment history, is available online to the public. Upon specific request, the NASD will release "disclosure information"—information pertaining to criminal actions, civil actions, customer complaints and securities-related terminations for cause—via mail or e-mail within two days of the request. The NASD gathers such disclosure information from the information provided by the individual broker on the Form U-4 (the Uniform Application for Securities Industry Registration or Transfer), not from a former employer's Form U-5 (see NASD Interpretive Material [IM] 8310-2). A Form U-4 must be completed when a broker initially seeks to register with the NASD or when a terminated broker reregisters upon obtaining employment with a new securities firm.

Certain information found on a terminated employee's Form U-5 can appear on BrokerCheck indirectly through the employee's responses to questions on the Form U-4. For example, question 14J of the Form U-4 requires a broker to state whether he or she has been discharged after allegations were made accusing the broker of "violating investment-related statutes, regulations, rules, or industry standards." The Form U-4 also contains a disclosure reporting page that corresponds to question 14J. The disclosure reporting page directs the broker to detail the allegations made by the prior employer (on the Form U-5) and allows the broker to rebut or comment on the termination. The Form U-4 statements, in turn, are subject to disclosure to investors through BrokerCheck. The NASD further provides a procedure for brokers to seek expungement of defamatory statements contained in the CRD.

4. In October 2003, plaintiff filed a Form U-4 with the NASD upon obtaining new employment. In response to question 14J, plaintiff indicated that he previously had been discharged after having been accused of violating investment-related laws. On the related disclosure reporting page, plaintiff repeated verbatim the statement MetLife made on its Form U-5. In response to the allegation, plaintiff wrote:

"I WAS TERMINATED ON ACCOUNT OF CERTAIN ALLEGED VIOLATIONS OF METLIFE POLICY REGARDING THIRD PARTY CHECKS, THIRD PARTY PAYORS AND CHARITABLE GIFTS. EACH OF THESE CHARGES WHICH METLIFE HAS CLAIMED LED TO MY TERMINATION IS COMPLETELY UNTRUE, WHICH MY ATTORNEYS HAVE

Plaintiff commenced this action in federal court seeking damages for employment discrimination, fraudulent misrepresentation, breach of contract and libel against defendants MetLife, Inc., Metropolitan Life Insurance Company and MetLife Securities, Inc. (collectively, MetLife). Plaintiff alleged that MetLife terminated his employment because he is a Hasidic Jew. With respect to his libel claim, plaintiff asserted that MetLife's statements on the Form U-5 were defamatory and made with malicious intent. After discovery, MetLife moved for summary judgment dismissing the complaint in its entirety.

The United States District Court for the Southern District of New York denied MetLife's motion as to plaintiff's discrimination claims and a breach of contract cause of action, but granted the motion dismissing plaintiff's fraudulent misrepresentation and libel claims. The court held that, under New York law, MetLife's statements on the Form U-5 were absolutely privileged. Following a trial on the remaining issues, the court dismissed plaintiff's contract claim and the jury found MetLife not liable on the discrimination claims.

On appeal, plaintiff contended that the District Court erroneously dismissed his libel claim on the basis that Form U-5 statements are absolutely privileged under New York law. The Second Circuit concluded that plaintiff presented an unsettled issue of New York law and certified a question to this Court: "Are statements made by an employer on an NASD employee termination notice ('Form U-5') subject to an absolute or a qualified privilege in a suit for defamation?" (453 F3d 122, 128 [2006].)

Plaintiff argues that a qualified, but not absolute, privilege attaches to statements made on a Form U-5. He submits that the filing of a Form U-5 is too remote from the NASD's quasi-judicial functions to warrant the application of an absolute privilege and asserts that one of the purposes of the form is to provide member firms with background information about a prospective employee. MetLife counters that an absolute privilege should apply because the filing of a Form U-5 with the NASD is a preliminary step in a quasi-judicial process and because such a privilege best serves the public interest in encouraging full and truthful disclosure.

CATEGORICALLY DEMONSTRATED TO METLIFE FOLLOWING MY TERMINATION. IN FACT, I HAVE STRONG REASON TO BELIEVE THAT I WAS TERMINATED SOLELY ON ACCOUNT OF THE FACT THAT I AM A HASSIDIC JEW."
These statements apparently became available to the investing public upon request, through BrokerCheck, in October 2003.

It is well settled that "[p]ublic policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action" (*Toker v Pollak*, 44 NY2d 211, 218 [1978]). "When compelling public policy requires that the speaker be immune from suit, the law affords an absolute privilege, while statements fostering a lesser public interest are only [qualifiedly] privileged" (*Liberman v Gelstein*, 80 NY2d 429, 437 [1992]).

Communications that are protected by a qualified privilege are not actionable unless a plaintiff can demonstrate that the declarant made the statement with malice. Malice in this context has been interpreted to mean spite or a knowing or reckless disregard of a statement's falsity (*see id.* at 437-438). Generally, a statement is subject to a qualified privilege when "it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is concerned" (*Toker*, 44 NY2d at 219 [internal quotation marks and citation omitted]).

In contrast, an absolute privilege immunizes a communicant from liability in a defamation action. The absolute privilege generally is reserved for communications made by individuals participating in a public function, such as executive, legislative, judicial or quasi-judicial proceedings. This protection is designed to ensure that such persons' "own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function" (*id.*; *see also Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 209 [1983] [participants are granted immunity "for the benefit of the public, to promote the administration of justice, and only incidentally for the protection of the participants"]).

Although statements made during the course of a judicial or quasi-judicial proceeding are clearly protected by an absolute privilege "as long as such statements are material and pertinent to the questions involved," we have indicated that the absolute privilege can extend to preliminary or investigative stages of the process, particularly where compelling public interests are at stake (*Wiener v Weintraub*, 22 NY2d 330, 331 [1968] [internal quotation marks and citations omitted]; *see also Julien J. Studley, Inc. v Lefrak*, 50 AD2d 162, 165 [2d Dept 1975], *affd insofar as appealed* 41 NY2d 881 [1977]). In *Wiener*, we held that a complaint letter accusing an attorney of misconduct that had been sent to the grievance committee of a bar association was absolutely privileged. We observed that the grievance committee

functions as a quasi-judicial body through its investigation of complaints and administration of disciplinary proceedings. We also emphasized the strong policy reasons warranting the extension of an absolute privilege to such complaints:

> "Assuredly, it is in the public interest to encourage those who have knowledge of dishonest or unethical conduct on the part of lawyers to impart that knowledge to a Grievance Committee or some other designated body for investigation. If a complainant were to be subject to a libel action by the accused attorney, the effect in many instances might well be to deter the filing of legitimate charges. We may assume that on occasion false and malicious complaints will be made. But, whatever the hardship on a particular attorney, the necessity of maintaining the high standards of our bar—indeed, the proper administration of justice—requires that there be a forum in which clients or other persons, unlearned in the law, may state their complaints, have them examined and, if necessary, judicially determined" (*Wiener*, 22 NY2d at 332).

A comparable public purpose is served by the NASD's regulatory regime for the securities industry. The NASD is the largest self-regulatory organization (SRO) subject to US Securities and Exchange Commission (SEC) oversight, and is the only "national securities association" registered under section 15A of the Securities Exchange Act of 1934 (Exchange Act) (*see* 15 USC § 78o-3).[5] As a securities association, the NASD is a quasi-governmental entity that has been delegated authority to enforce the requirements of the Exchange Act and is the primary regulator of the broker-dealer industry. In accordance with section 15A of the Exchange Act, the NASD has promulgated rules designed to prevent fraudulent practices and protect the investing public (*see* 15 USC § 78o-3 [b] [6]). Although the SEC has the power to regulate the NASD's members, "as a practical matter the bulk of the day-to-day regulation is generally delegated to the [NASD]" (4 Hazen, Securities Regulation

---

**5.** The NASD currently oversees the activities of over 5,000 brokerage firms and more than 660,000 registered securities representatives (*see* About NASD <http://www.nasd.com/AboutNASD/index.htm> [last updated Mar. 5, 2007]). Other SROs, such as the New York Stock Exchange and the American Stock Exchange, are registered as national securities exchanges under section 6 of the Exchange Act (*see* 15 USC § 78f).

§ 14.3 [3], at 127 [5th ed]). Indeed, SROs, like the NASD, have been described as "stand[ing] in the shoes of the SEC because they perform regulatory functions that would otherwise be performed by the SEC" (*DL Capital Group, LLC v Nasdaq Stock Mkt., Inc.*, 409 F3d 93, 95 [2d Cir 2005] [internal quotation marks and citation omitted]).

One of the NASD's central responsibilities involves the investigation and adjudication of suspected violations of the SEC's laws and regulations as well as the NASD's own rules (*see* 15 USC § 78o-3 [b] [7], [8]). During the investigative stage of this quasi-judicial process, the NASD has the power to inspect and copy any books, records or accounts related to the investigation and may require individuals to testify under oath or provide information in writing (*see* NASD rule 8210).[6] Disciplinary proceedings against registered representatives for securities violations may take place before a NASD hearing panel (*see* NASD rules 9213, 9221). Sanctions for violations include censures, fines, suspensions and expulsions (*see* NASD rule 8310). NASD disciplinary determinations are subject to SEC and judicial review (*see* 15 USC § 78s [d], [e]; § 78y [a] [1]).

The Form U-5 plays a significant role in the NASD's self-regulatory process. Filing is mandatory within 30 days of termination of the registered representative and firms are subject to penalties should they fail to comply. Upon receipt of the Form U-5, the NASD routinely investigates terminations for cause to determine whether the representative violated any securities rules. The form "is often the first indication that the NASD receives regarding possible misconduct by members of the securities industry, and investigations of misconduct reported on the Form U-5 frequently lead to the initiation of disciplinary action by the NASD" (Wright, *Form U-5 Defamation*, 52 Wash & Lee L Rev 1299, 1304 [1995]). As such, the compulsory Form U-5 can be viewed as a preliminary or first step in the NASD's quasi-judicial process. It is also designed to aid prospective member employers in researching the backgrounds of potential employees. To that end, the NASD requires a member firm to review an applicant's most recent Form U-5 during the hiring process (*see* NASD rule 3010 [e]).

The public interests implicated by the filing of Forms U-5 are significant. The form is designed to alert the NASD to potential

---

6. Members who refuse to comply with the NASD's requests are subject to suspension (*see* NASD rule 9552).

misconduct and, in turn, enable the NASD to investigate, sanction and deter misconduct by its registered representatives. The NASD's actions ultimately inure to the benefit of the general investing public, which faces the potential for substantial harm if exposed to unethical brokers. Accurate and forthright responses on the Form U-5 are critical to achieving these objectives.

The Form U-5's compulsory nature and its role in the NASD's quasi-judicial process, together with the protection of public interests, lead us to conclude that statements made by an employer on the form should be subject to an absolute privilege. Analogously, close to 40 years ago in *Wiener* we determined that complaints involving attorneys should be accorded an absolute privilege because of "the necessity of maintaining the high standards of our bar" (*Wiener*, 22 NY2d at 332). The regulation of registered brokers in the securities industry is of no less importance.[7] We further note that registered employees who are maliciously defamed on a Form U-5 are not wholly without remedy as they may commence an arbitration proceeding or court action to expunge any alleged defamatory language.

Accordingly, the certified question should be answered as follows: Statements made by an employer on a NASD employee termination notice are subject to an absolute privilege in a suit for defamation.

PIGOTT, J. (dissenting). I respectfully dissent because I disagree with the majority's holding that statements made by an employer on a Form U-5 are part of a quasi-judicial process and that the public interest is best served by affording the statements an absolute privilege. Rather, I would answer the certified question by stating that such statements are protected by a qualified privilege.

As a matter of public policy, an absolute privilege has been afforded in very few situations (*see Park Knoll Assoc. v Schmidt*, 59 NY2d 205 [1983]; *see also Clark v McGee*, 49 NY2d 613 [1980]). These situations have historically involved individuals participating in a public function, including judicial, legislative,

---

7. We acknowledge that, unlike the complaint letter in *Wiener*—which was subject to the confidentiality requirements of Judiciary Law § 90 (10)—statements made on a Form U-5 are reviewed by prospective employers, and may indirectly become available to the investing public via the NASD's Broker-Check program. But we do not read the confidentiality aspect as dispositive in *Wiener* and we believe an absolute privilege better serves the substantial public interests promoted by the NASD regulatory scheme.

or executive proceedings (*see Toker v Pollak*, 44 NY2d 211 [1978]). For example, in *Wiener v Weintraub* (22 NY2d 330 [1968]), we extended an absolute privilege to individuals who filed complaints to the Grievance Committee of the Association of the Bar of the City of New York. In affording such a privilege, we noted that complaints alleging professional misconduct by an attorney had once been presented to Supreme Court, but were now filed with the Grievance Committee of a bar association. By investigating such complaints and conducting disciplinary hearings, the bar association's Grievance Committee acted as a quasi-judicial body and "an arm of the Appellate Division" (*id.* at 332).

Unlike the complaints in *Wiener*, statements made on a Form U-5 are not intended to be part of any court proceeding nor are they presented to a committee having attributes similar to a court. Rather, they are filed by an employer for the primary purpose of notifying the National Association of Securities Dealers' (NASD) Central Registration Depository system of a change in an employee's registration status.[1] While the information on a Form U-5 could possibly trigger an investigation or even serve as evidence in a later disciplinary proceeding,[2] the vast majority of the Forms, being merely informational, do not result in action on the part of any regulatory agency. There is no requirement that the NASD or the New York Stock Exchange (NYSE) take disciplinary action with respect to the information contained on a Form U-5. Indeed, in this case, there was no action taken by any agency that would provide Mr. Rosenberg with an opportunity to challenge the statements made on his Form U-5.[3] Thus, the majority's holding provides an absolute

---

1. The filing of a Form U-5 is unlike a complaint issued pursuant to the NASD Code of Procedure (rule 9000 series), which governs proceedings for disciplining a member or person associated with a member (*see* NASD rule 9211 [a]). A "disciplinary proceeding shall begin when the complaint is served and filed" (*see* rule 9211 [b]).

2. As the majority points out, one of the responsibilities of the NASD is to investigate and adjudicate suspected violations of the Securities and Exchange Commission's (SEC) laws and the NASD's rules. Although this function could fairly be described as quasi-judicial, the NASD has only a limited immunity from defamation in the context of reporting its findings (*see* 15 USC §§ 78o-3, 78iii [b] [no liability if reporting made in "good faith"]).

3. The fact that Mr. Rosenberg could have commenced an arbitration proceeding or a court action to expunge the alleged defamatory language, as noted by the majority, is only further proof that the Form U-5 is not part of any quasi-judicial process. If the Form U-5 were part of a quasi-judicial process, then an expungement action would be entirely unnecessary. Indeed,

privilege to statements made on a Form U-5 where no judicial or even "quasi-judicial" proceeding is even contemplated. The submission of the Form simply does not represent a preliminary or investigative stage in any quasi-judicial process.

Nor does public policy require that statements made by employers on a Form U-5 be free from liability in a defamation action. When a defamatory statement is made on such a Form, there is the danger of substantial harm to the individual about whom the statement is made. Unlike statements made in a complaint to a grievance committee that are confidential,[4] the Form U-5 is widely disseminated. Indeed, potential employers in the securities industry are required to review an individual's Form U-5 during the hiring process (see NASD rule 3010 [e]). As a consequence, defamatory Form U-5 reporting can unfairly penalize a departing employee and prevent that employee from obtaining new employment or retaining existing customers. "[I]t is widely acknowledged that false Form U-5 reporting has sometimes been used to retaliate against departing employees or threatened to gain concessions from such employees" (Wright, *Form U-5 Defamation*, 52 Wash & Lee L Rev 1299, 1302 [1995]; see *Baravati v Josephthal, Lyon & Ross, Inc.*, 28 F3d 704, 708 [7th Cir 1994] ["To insulate the (NASD) members from liability for the contents of their U-5s would be tantamount to allowing a member of the NASD to blackball a former employee from employment throughout the large sector of the industry that the membership of the association constitutes"]). Because of the serious personal and financial interests of the employee at stake, member firms should not be completely immune from all liability for defamatory Form U-5 statements.

The majority focuses on the fact that accurate and forthright responses on the Form U-5 are critical to the financial industry. However, it should be remembered that not only is truth a complete defense to a defamation claim (see *Brian v Richardson*, 87 NY2d 46 [1995]), but a qualified privilege offers strong protection as well. To overcome a qualified privilege, the employee would have the burden of showing that a statement is actionable because it was motivated by malice (see *Toker*, 44

---

a costly expungement action is often the only means by which an employee may challenge defamatory statements made on a Form U-5.

4. In *Wiener*, we noted that any risk of prejudice for statements made in a complaint to a grievance committee was completely "eliminated" because such complaints are deemed "private and confidential" (see *Wiener*, 22 NY2d at 331, quoting Judiciary Law § 90 [10]).

NY2d at 219; *Liberman v Gelstein*, 80 NY2d 429 [1992]). Therefore, truthful and accurate statements on a Form U-5 would not give rise to defamation liability concerns.

Finally, affording statements made on a Form U-5 a qualified, rather than absolute, privilege would provide New York employees in the securities industry the same protections and rights afforded to brokers in other states and create a uniform standard to be applied (*see e.g. Dawson v New York Life Ins. Co.*, 135 F3d 1158 [7th Cir 1998] [applying Illinois law]; *Glennon v Dean Witter Reynolds, Inc.*, 83 F3d 132 [6th Cir 1996] [applying Tennessee law]; *Eaton Vance Distribs., Inc. v Ulrich*, 692 So 2d 915 [Fla Dist Ct App 1997]).

Because the Form U-5 is not a part of any judicial process, and given the serious potential damage to an employee's reputation and business prospects, any communication associated with the Form is amply protected by a qualified rather than an absolute privilege.

Judges CIPARICK, READ and JONES concur with Judge GRAFFEO; Judge PIGOTT dissents and votes to answer the certified question by stating that such statements are protected by a qualified privilege, in a separate opinion in which Judge SMITH concurs; Chief Judge KAYE taking no part.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered as follows: Statements made by an employer on a NASD employee termination notice are subject to an absolute privilege in a suit for defamation.