Filed 11/24/20  Arges v. LPL Financial CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TERRANCE ARGES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LPL FINANCIAL, LLP, <br><br> Defendant and Respondent. | D076790 <br><br><br> (Super. Ct. No. 37-2019-00014334-CU-BC-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Mirch Law Firm, Kevin J. Mirch and Marie C. Mirch for Plaintiff and Appellant.

Markin Zusman Freniere & Compton and Kevin K. Eng for Defendant and Respondent.


I

INTRODUCTION

Plaintiff Terrance Arges appeals an order granting defendant LPL Financial LLP's (LPL) special motion to strike Arges's complaint under Code

of Civil Procedure section 425.16 (the anti-SLAPP law).[1] LPL, a securities broker-dealer firm, and Arges, a broker who worked for LPL, were named as defendants in a lawsuit filed by an individual named Yulia Romero (hereafter, the *Romero* litigation). In that lawsuit, Romero alleged Arges engaged in investment-related misconduct while he was an agent of LPL. LPL disclosed the *Romero* litigation to Financial Industry Regulatory Authority, Inc. (FINRA), a self-regulatory organization that oversees securities firms that do business with the public. (*Flowers v. Financial Industry Regulatory Authority, Inc.* (2017) 16 Cal.App.5th 946, 949 (*Flowers*).) Arges then filed this action against LPL based on LPL's disclosure of the *Romero* litigation to FINRA.

We conclude the trial court properly granted LPL's anti-SLAPP motion. LPL's disclosure was protected conduct as a communication made before an official proceeding. (§ 425.16, subd. (e)(1).) Further, Arges did not establish a probability of success as to his causes of action because LPL's disclosure was protected by the official proceeding privilege codified in Civil Code section 47, subdivision (b). (§ 425.16, subd. (b)(1).) Therefore, we affirm the order granting LPL's anti-SLAPP motion.

II

BACKGROUND

A

*FINRA*

FINRA is a private, not-for-profit corporation and a self-regulatory organization authorized under title 15 United States Code section 78*o*-3 et seq. (*Flowers, supra,* 16 Cal.App.5th at p. 949.) FINRA is " ' "responsible for

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise noted.

2

regulatory oversight of all securities firms that do business with the public; professional training, testing and licensing of registered persons; [and] arbitration and mediation" ' " of disputes between investors and securities firms. (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1128 (*Lickiss*).) It is "subject to extensive oversight" by the U.S. Securities and Exchange Commission (SEC) (*Flowers*, at p. 950), and it has the "power to promulgate rules that, once adopted by the SEC, have the force of law," (*McDaniel v. Wells Fargo Investments, LLC* (9th Cir. 2013) 717 F.3d 668, 673).[2]

"Before engaging in activities as a registered representative for a FINRA-member firm, all registered representatives of broker-dealers, investment advisors, and securities issuers must sign a 'Uniform Application for Securities Industry Registration or Transfer,' commonly referred to as Form U-4." (*Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 613; see Cal. Code Regs., tit. 10, § 260.210, subd. (a).) "The Form U-4 is a contract between the regulatory organization (here FINRA) and the individual registrant." (*Valentine*, at p. 613.) It "requires a detailed history of the applicant's background, including past history in the securities industry and any customer complaints that may have arisen in that connection." (5 Hazen, Treatise on the Law of Securities Reg. (7th ed. 2020) FINRA Reg. of Associated Persons, § 14:67.) After the Form U-4 is completed, the member-firm must file the executed Form U-4 with FINRA on

---

[2]    "Prior to 2007, FINRA was known as the National Association of Securities Dealers (the NASD); in 2007, the NASD consolidated its regulatory functions with the regulatory functions … [of] the New York Stock Exchange and changed its name to FINRA." (*Flowers*, *supra*, 16 Cal.App.5th at p. 949.)

behalf of the registered representative.[3]  (FINRA Bylaws, Art. V, § 2; FINRA Rule 1010; Cal. Code Regs., tit. 10, § 260.210, subd. (b)(1).)

When a registered representative departs a member-firm, the firm is required to file with FINRA a Uniform Termination Notice for Securities Industry Registration Form (Form U-5) (together with the Form U-4, the U-Forms).  (FINRA Bylaws, Art. V, § 3(a); see Cal. Code Regs., tit. 10, § 260.210, subd. (b)(4).)  The Form U-5 requires the firm to "explain the reasons for termination" and answer "questions that address whether the employee ha[s] been subject to criminal charges, customer complaints or an internal review for violating investment-related rules."[4]  (*Rosenberg v.*

_____

[3]     The FINRA bylaws, rules, and U-Forms are not part of the record, although the parties reference them in their briefs.  We take judicial notice of these materials on our own motion.  (Evid. Code, §§ 452, subd. (h), 459; *Royal Alliance, Inc. v. Liebhaber* (2016) 2 Cal.App.5th 1092, 1097.)

[4]     For instance, Question 7E(1) states:  "In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations* and which: [¶] (a) is still pending, or; [¶] (b) resulted in an arbitration award or civil judgment against the individual, regardless of amount, or; [¶] (c) was settled, prior to 05/18/2009, for an amount of $10,000 or more, or; [¶] (d) was settled, on or after 05/18/2009, for an amount of $15,000 or more?"

In addition, Question 7E(2) states:  "In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated (written or oral) complaint, which alleged that the individual was *involved* in one or more *sales practice violations*, and which [¶] (a) was settled, prior to 05/18/2009, for an amount of $10,000 or more, or; [¶] (b) was settled, on or after 05/18/2009, for an amount of $15,000 or more?"

If the firm answers one or more of these questions in the affirmative, it must then complete a disclosure reporting page providing additional detail concerning the arbitration, civil litigation, or complaint.

4

*Metlife, Inc.* (2007) 8 N.Y.3d 359, 362 (*Rosenberg*).) The Form U-5 alerts FINRA to "possible misconduct by members of the securities industry, and investigations of misconduct reported on the Form U-5 frequently lead to the initiation of disciplinary action" by FINRA against registered representatives. (Wright, *Form U-5 Defamation* (1995) 52 Wash. & Lee L.Rev. 1299, 1304; see FINRA Reg. Notice 10-39 (Sept. 2010).)

Under the Securities Exchange Act of 1934, FINRA is required to "maintain information in a central registration depository (CRD) database about its member firms as well as their current and former registered representatives, including their broker representatives." (*Flowers*, *supra*, 16 Cal.App.5th at p. 950; see 15 U.S.C. § 78*o*-3(i)(1)(A).) "In general, information in the CRD system is obtained through [U-Forms] …." (Securities and Exchange Com., Release No. 34-88760 (Apr. 28, 2020), 85 Fed.Reg. 26502, 26503 (May 4, 2020).) Certain information from the CRD—including information obtained from U-Forms—is published and made available to the public on an online application called BrokerCheck. (*Lickiss*, *supra*, 208 Cal.App.4th at p. 1129.)

B

*The* Romero *Litigation*

Arges is a financial broker. In March 2013, he became a registered representative of LPL, a securities broker-dealer firm licensed and registered with FINRA. Arges departed LPL in April 2016.

In March 2017, an individual named Yulia Romero filed a state court complaint against Arges and LPL based on conduct Arges allegedly undertook while he was a registered representative of LPL. Romero alleged Arges convinced her to "entrust her funds to his control and decision-making, so that he could create and build a client portfolio …." She alleged Arges

5

opened a stock trading account in her name, "traded, gambled, and lost $120,000 of [her] money on speculative, unsuitable, risky, market-timing stock trades," and threatened her to "prevent her from seeking redress for his improprieties." She also alleged LPL, in its capacity as Arges's principal, failed to advise her of the risks associated with Arges's stock trades. Based on these allegations, Romero asserted a negligence cause of action against LPL and breach of fiduciary duty, breach of contract, fraud, negligent misrepresentation, unfair business practices, negligence, and extortion causes of action against Arges.

Soon after Romero filed suit, Romero and LPL reached a settlement agreement. Under the settlement agreement, Romero dismissed LPL from the case in return for $15,000.

Arges filed a cross-complaint against Romero, the details of which are not apparent from the record. Romero and Arges later reached a settlement agreement under which Romero dismissed her causes of action against Arges. According to Arges, Romero "pa[id] a substantial settlement amount" to him under the settlement agreement.

LPL reported the *Romero* litigation to FINRA on its U-Form filings. The reported information was added to the CRD and made publicly-available on Arges's BrokerCheck report. Under a heading that reads "Customer Dispute - Settled," Arges's BrokerCheck report includes two disclosures related to the *Romero* litigation.

LPL provided the first disclosure, which identifies the *Romero* litigation by caption, docket number, and court, and summarizes the *Romero* litigation as follows:

> [ROMERO] ALLEGES BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, FRAUD, MISREPRESENTATION, NEGLIGENCE, EXTORTION, FAILURE TO SUPERVISE WITH

6

REGARD TO CLAIMS THAT [ARGES] SOLICITED HER TO INVEST IN ALLEGEDLY UNSUITABLE SECURITIES VIA AN ONLINE BROKERAGE ACCOUNT, WHICH BROKERAGE ACCOUNT WAS NEITHER OFFERED NOR APPROVED BY LPL, AND FURHTER [sic] THAT SHE SUSTAINED LOSSES OF $120,000, WHICH [ARGES] EXTORTED HER NOT TO DISCLOSE.

LPL's disclosure states the *Romero* litigation was settled, there was a "Monetary Compensation Amount" of $15,000, and there was an "Individual Contribution Amount" of zero for the settlement. It also includes a statement from LPL indicating that, according to LPL's records, Romero was not an LPL customer.

Arges provided the second disclosure, which includes substantially the same information as LPL's disclosure, as well as the following statement from Arges:

> [Romero] is my ex-fiancé who sued me after our relationship ended. She traded her own account at a discount broker [sic] and made some of the trades I did in my account. She also bought stocks that I did not. I never asked for or received any commissions. She chose not to open an account with me to avoid paying any fees to my firm. There was no contract, compensation, or brokerage relationship. The claims are false and I will seek expungement under the applicable FINRA rules.

C

*The FINRA Arbitration and the Present Litigation*

Arges undertook a two-prong approach to remove the information concerning the *Romero* litigation from the CRD and BrokerCheck.

First, Arges filed an arbitration with FINRA's Office of Dispute Resolution to expunge the information under FINRA Rule 2080. In his statement of claim, Arges alleged he never served as Romero's broker, Romero's complaint was false, and the publicly-available information concerning the *Romero* litigation impeded his ability to obtain employment

7

and clients. He filed a declaration from Romero in which she averred she was never a customer of LPL and she supported the expungement request.[5] LPL did not oppose the expungement request. Ultimately, the arbitration panel found Romero's allegations were "entirely false" and recommended expungement of the *Romero* litigation information from Arges's records. Arges filed a petition to confirm the arbitration award, which was pending at the time the parties filed their briefs in this appeal.[6]

Second, Arges filed the present litigation against LPL for reporting the *Romero* litigation on its U-Forms. He alleged the charges in the *Romero* litigation were false and Romero sued him because he and Romero were in a romantic relationship that ended poorly. He alleged LPL knew Romero's allegations were false and reported them to FINRA "to undermine his ability to obtain and keep his financial clients." Arges asserted breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, intentional misrepresentation, negligent misrepresentation, and defamation causes of action against LPL. He sought damages and declaratory relief expunging the *Romero* litigation from the CRD and his BrokerCheck records.

---

[5] According to Arges, the settlement agreement between Arges and Romero required Romero "to aid in the removal" of information concerning the *Romero* litigation from BrokerCheck.

[6] On the literal eve of oral argument in this appeal, Arges requested judicial notice of a trial court order confirming the arbitration award, dated August 7, 2020. We deny the request for judicial notice. The recent trial court order is not relevant to whether LPL's earlier disclosure to FINRA—which occurred years ago—was privileged. Nor is it relevant to any other issue presented in this appeal.

# D

## *The Anti-SLAPP Motion*

Shortly after Arges filed suit, LPL filed a special motion to strike Arges's complaint under the anti-SLAPP law. LPL argued Arges's causes of action arose from protected conduct because they were based on LPL's U-Form disclosures to FINRA, which LPL claimed were "written or oral statement[s] or writing[s] made before a[n] … official proceeding authorized by law …." (§ 425.16, subd. (e)(1).) LPL asserted Arges could not establish a probability of success on his causes of action because LPL's disclosures were absolutely privileged under Civil Code section 47, subdivision (b). Together with its motion, LPL filed the complaint from the *Romero* litigation and Arges's BrokerCheck report.

Arges opposed LPL's anti-SLAPP motion. In a one-paragraph discussion, he asserted his causes of action did not arise from protected conduct because LPL disclosed the *Romero* litigation "privately in accordance with FINRA rules and regulations," not as part of "an official proceeding or petition …." Next, he contended there was a likelihood he would prevail on his causes of action because LPL's U-Form disclosures were not privileged. He argued U-Form disclosures are, at most, entitled to a qualified privilege—not an absolute privilege—and the allegedly malicious nature of LPL's conduct precluded application of even a qualified privilege. Further, Arges asserted the absolute privilege bars civil liability only for torts and, therefore, the privilege did not apply to his breach of contract cause of action.

Arges did not file evidence together with his opposition brief. However, he sought judicial notice of the following documents: (1) the statement of claim from his FINRA arbitration; (2) LPL's answer from the FINRA arbitration; and (3) two FINRA arbitration awards in which arbitration

9

panels ordered expungement of allegedly defamatory U-Form statements and awarded damages to the prevailing claimants. The prevailing claimants were not parties to the present litigation, but Arges claimed the awards were nonetheless relevant to show "FINRA has awarded damages for defamation for language put on a [sic] U-5 in many arbitrations."

The trial court granted Arges's request for judicial notice of the filings from his own FINRA arbitration, denied his request for judicial notice of the non-party FINRA arbitration awards, and granted LPL's anti-SLAPP motion. The court found Arges's complaint arose from LPL's "filing of forms U-4 and U-5 with FINRA" and concluded the forms were protected "communications made before an official proceeding." The court also determined Arges did not establish a probability of success on his causes of action because LPL's statements were absolutely privileged under Civil Code section 47, subdivision (b). It found the privilege barred Arges's entire complaint, including the breach of contract cause of action, because "[t]he gravamen of all of [Arges's] causes of action [was] the statements contained in Forms U-4 and U-5 …." Therefore, the court struck Arges's complaint and entered judgment in LPL's favor.

## III

## DISCUSSION

### A

### *Anti-SLAPP Law*

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike claims 'arising from any act of that person in furtherance of the person's right

10

of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' " (*Wilson*, *supra*, 7 Cal.5th at p. 884.) "A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.)

If the defendant satisfies its burden under the first step of the analysis, " 'the burden shifts to the plaintiff to demonstrate the merit of [its] claim[s] by establishing a probability of success.' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*).) At this second step, the plaintiff " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Ibid.*) " 'The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' " (*Ibid.*)

We review an order granting or denying an anti-SLAPP motion de novo. (*Monster Energy, supra,* 7 Cal.5th at p. 788.)

B

*Step One: Protected Activity*

Under the first step of the anti-SLAPP analysis, we must examine whether LPL's U-Form disclosures were protected communications. The trial court found, and LPL maintains, the disclosures were protected because they were "written or oral statement[s] or writing[s] made before … [an] official proceeding authorized by law." (§ 425.16, subd. (e)(1).) We agree.

In reaching this conclusion, we are guided by *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 729 (*Fontani*), disapproved on another ground by *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, fn. 5 (*Kibler*). In *Fontani*, an employer-firm terminated a broker-dealer and reported the reasons for the termination (the broker-dealer failed to provide a prospectus with a solicitation, engaged in twisting, and solicited clients outside California) to NASD (FINRA's predecessor) on a Form U-5. (*Id.* at pp. 725–726.) The broker-dealer sued the firm for defamation and interference with prospective advantage based on the firm's Form U-5 disclosures. (*Id.* at p. 726.) The firm moved to strike these causes of action under the anti-SLAPP law, the trial court denied the motion without elaboration, and the Court of Appeal reversed. (*Id.* at pp. 726–727, 737.)

As the *Fontani* court explained, NASD was an official body for purposes of section 425.16, subdivision (e)(1) because it stood "as a regulatory surrogate for the SEC" in its "capacity as the recipient of the Form U-5 …." (*Fontani*, *supra*, 129 Cal.App.4th at p. 729.) Further, the court reasoned the Form U-5 disclosure was a statement or writing made before an "official proceeding," regardless of whether NASD ultimately investigated the broker-dealer, because "investigation [was] at least one potential consequence of [the] Form U-5 filing that contain[ed] allegations of improper conduct by a

12

broker dealer." (*Fontani*, at p. 731.) We agree with, and adopt, the *Fontani* court's conclusion that U-Form statements are communications made before an official proceeding where, as here, they may result in an investigation.[7]

Arges does not dispute that FINRA is an official body or that disclosures on U-Forms, under appropriate circumstances, can be protected communications made before an official proceeding. However, he claims LPL's U-Form disclosures were not protected because LPL was not required to report the *Romero* litigation to FINRA. He argues the U-Forms require disclosure only of investment-related actions initiated by *consumers* and Romero was his ex-fiancé—not a consumer. In effect, Arges contends LPL had no duty to disclose the *Romero* litigation because it was meritless and LPL knew, or should have known, Romero's allegations were untrue. We are not persuaded.

As an initial matter, Arges did not present the trial court with his claim that LPL's disclosures were unprotected activities based on Romero's alleged status as a non-consumer. Arges has forfeited the argument by raising it for the first time on appeal. (See *World Financial Group, Inc. v. HBW Insurance & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1569, fn. 7 ["Although we review the trial court's ruling on a SLAPP motion de novo, our task is to determine whether defendants demonstrated *to the*

---

[7] FINRA possesses other attributes confirming that U-Form statements may be protected communications made before an official proceeding. FINRA "serves an important public interest," (*Kibler*, *supra*, 39 Cal.4th at p. 199), as its rules are intended "to prevent fraudulent and manipulative acts and practices … and, in general, to protect investors and the public interest …." (15 U.S.C. § 78o-3(b)(6).) FINRA's disciplinary determinations—which can result from disclosures on U-Forms—are also subject to review by the SEC (15 U.S.C. § 78s(d)(2)) and, thereafter, by the appropriate U.S. Court of Appeals (15 U.S.C. § 78y(a)(1)). (See *Kibler*, at p. 200.)

*trial court* that the lawsuit arises from protected activity."]; see also *Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1526.)

In any event, whether Romero's allegations were the machinations of an ex-fiancé had no effect on LPL's duty to disclose the *Romero* litigation or whether LPL's disclosure might have resulted in a FINRA investigation. The U-Forms do not restrict firms' disclosure duties to encompass only *meritorious* investment-related complaints, arbitrations, or civil litigations. Such a limitation would inject an unwelcome degree of subjectivity and uncertainty into the disclosure regime. It would also impede one of the main purposes of the U-Forms—providing FINRA with "information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations." (FINRA Reg. Notice 10-39 (Sept. 2010).)

Indeed, FINRA mandates the reporting of credible and baseless investment-related actions alike. (*Dawson v. New York Life Insurance Co.* (7th Cir. 1998) 135 F.3d 1158, 1164 ["[E]ven meritless complaints against agents must be reported on Forms U–5"] disapproved on another ground as recognized by *Glickenhaus & Co. v. Household International, Inc.* (7th Cir. 2015) 787 F.3d 408.) To the extent Arges claims that certain references on the U-Forms to "consumer-initiated" actions restrict firms' disclosure duties only to those situations in which firms *know* the complainants are consumers, we do not adopt Arges's cramped reading of the U-Forms. (See *Andrews v. Prudential Securities, Inc.* (6th Cir. 1998) 160 F.3d 304, 307–309 [concluding firm-*solicited* consumer claims constituted consumer-*initiated* claims subject to disclosure on Form U-5].) Rather, we conclude a firm's duty to disclose turns on whether a registered representative was named as a defendant in, or the subject of, an investment-related complaint, arbitration, or lawsuit in

14

which it is *alleged* that he or she committed sales practice violations against a consumer. (Form U-4 Question 14I(1)–(5); Form U-5 Question 7E(1)–(5).)

The *Romero* litigation plainly meets this threshold. In her lawsuit, Romero alleged Arges served as her financial advisor and broker. She further alleged Arges, as an agent of LPL, engaged in investment-related misconduct, including losing $120,000 of her funds, failing to disclose known risks associated with his stock trades, and depriving her of investor protections. This is precisely the type of action that is subject to disclosure on a U-Form. Thus, it is evident LPL was obligated to disclose the *Romero* litigation to FINRA. And it is equally evident that a FINRA investigation was a possible consequence of LPL's disclosures. Because LPL's disclosures were preparatory to an investigation, we conclude they were protected communications made before an official proceeding.[8]

## C

### *Step Two: Probability of Success*

Under the second step of the anti-SLAPP analysis, we must determine whether Arges established a probability of success on his causes of action. (§ 425.16, subd. (b)(1).) The trial court found Arges failed to meet this burden because LPL's U-Form disclosures were privileged under Civil Code section 47, subdivision (b). We discern no error in the trial court's finding.

Civil Code section 47, subdivision (b), establishes a privilege applicable to communications made in any legislative, judicial, or other legally-

---

[8] Arges asserts in passing that LPL was not required to notify FINRA of the *Romero* litigation because he departed LPL before the *Romero* litigation was filed. There is no merit to this argument. LPL was required to amend its Form U-5 when it learned of facts causing its previously-filed Form U-5 to become inaccurate or incomplete. (FINRA Bylaws, Art. V, § 3(b).) This duty to amend arose when LPL learned of the *Romero* litigation, which concerned allegations of wrongdoing during Arges's tenure at LPL.

authorized official proceeding, or in the initiation or course of any other proceeding authorized by law and reviewable under the statutes governing writs of mandate. It "is referred to as an 'absolute' privilege, and it bars all tort causes of action except a claim for malicious prosecution." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360 (*Hagberg*).) The official proceeding privilege "serves the important public policy of assuring free access to the courts and other official proceedings" and " ' "assure[s] utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing*." ' " (*Ibid.*)

"The 'official proceeding' privilege has been interpreted broadly to protect communications to or from *governmental* officials which may precede the initiation of formal proceedings." (*Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156.) "If the communication is made 'in anticipation of or [is] designed to prompt official proceedings, the communication is protected.' " (*Hagberg*, *supra*, 32 Cal.4th at p. 368; see *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 [the "privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action."].)

Applying these principles, the *Fontani* court determined the filing of a Form U-5 can be privileged under Civil Code section 47, subdivision (b). (*Fontani*, *supra*, 129 Cal.App.4th at p. 734.) The court reasoned that "Civil Code section 47, subdivision (b) protects communications made in preparation for or to prompt an investigation." (*Id.* at p. 734.) In the case before the *Fontani* court, the defendant-employer's U-Form statements concerning the basis for the broker-dealer's termination was a "precursor to an investigation" by NASD. (*Id.* at p. 735.) Therefore, the *Fontani* court

16

determined the statements were subject to the official proceeding privilege. (*Ibid.*; see also *Adjian v. JPMorgan Chase Bank, N.A.* (9th Cir. 2017) 697 Fed.Appx. 528, 530 ["The filing of the Form U-5 under the circumstances of this case was absolutely privileged under § 47(b)."]; *Sullivan v. SII Investments, Inc.* (N.D. Cal., Feb. 20, 2018, 18-cv-00666-SI) 2018 U.S. Dist. Lexis 28067 [firm's "U5 filing [was] protected by absolute privilege under section 47"].)

Similarly, LPL's U-Form disclosures concerning the *Romero* litigation— specifically, its disclosures concerning Romero's allegations of Arges's investment-related misconduct while he acted as an agent of LPL—could have prompted a FINRA investigation and disciplinary proceedings against LPL and/or Arges. For the reasons expressed in *Fontani*, we conclude LPL's disclosures were privileged under Civil Code section 47, subdivision (b). As the trial court noted, Arges's entire complaint arises from LPL's privileged disclosures. Accordingly, the trial court correctly found that Arges did not satisfy his second-step burden under the anti-SLAPP law. (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 767.)

Arges asserts four arguments as to why the official proceeding privilege did not preclude him from establishing a probability of success on his claims.

First, Arges claims the official proceeding privilege did not apply to LPL's disclosure because Romero was not a consumer of LPL and, therefore, LPL was not obligated to report the *Romero* litigation. We previously discussed and rejected this argument in our first-step anti-SLAPP analysis. For the reasons previously articulated, we reject the argument here as well.

Second, Arges—relying on decisions from other jurisdictions—claims U-Form statements should be subject only to a qualified immunity, which can be overcome by a showing of malice. As the *Fontani* court persuasively

17

explained, however, the jurisdictions in which these decisions were issued generally "do not afford the litigation privilege to the preliminary or investigative stages of otherwise protected proceedings." (*Fontani*, *supra*, 129 Cal.App.4th at p. 734.) By contrast, California extends the official proceeding privilege to "communications made in preparation for or to prompt an investigation." (*Ibid.*) Given the reach of our state's official proceeding privilege, we adopt the *Fontani* court's conclusion that an absolute privilege applies to qualifying U-Form disclosures. (*Ibid.*; cf. *Rosenberg*, *supra*, 8 N.Y.3d at pp. 367–368 [Form U-5 statements receive absolute privilege under New York law].)[9]

Indeed, we recently reiterated these principles in *Tilkey v. Allstate Insurance Co.* (2020) 56 Cal.App.5th 521 (*Tilkey*). As we explained in *Tilkey*, when a Form U-5 "identifies allegations of improper conduct by a broker-dealer, an issue that FINRA may need to investigate, it can on those occasions be considered 'a communication made "in anticipation of an action or other official proceeding." [Citation.]' [Citation.] In those instances, the information reported on the Form U5 would be protected by the absolute privilege outlined in Civil Code section 47, subdivision (b)." (*Id.* at p. 545.) Stated differently, "the absolute privilege extends to communications required by FINRA, i.e., fraud- and securities-related information and other

---

9 As noted, the trial court denied Arges's request for judicial notice of arbitration awards in favor of non-party claimants. Arges asserts judicial notice was warranted because the awards showed that U-Form filings are not absolutely privileged. We disagree. The awards did not mention, let alone analyze, whether statements on U-Form filings may be privileged. "[C]ases are not authority for propositions not considered." (*Hagberg*, *supra*, 32 Cal.4th at p. 374.) In any event, Arges presents no authority or analysis as to why the arbitrators' determinations on these matters would be binding on the trial court or the Court of Appeal.

information covered by its rules."[10]  (*Id.* at p. 546.)  As previously noted, the Form U-5 filed by LPL contained precisely the type of fraud and investment-related allegations that may give rise to a FINRA investigation.  It was, therefore, absolutely privileged.[11]

Third, Arges claims the official proceeding privilege does not apply to his breach of contract cause of action.  "[G]enerally the [section 47] privilege is 'described as one that precludes liability in tort, not liability for breach of contract.' " (*McNair v. City & County of San Francisco* (2016) 5 Cal.App.5th 1154, 1169.)  However, the privilege can bar liability for a breach of contract cause of action when it "would further the policies underlying the privilege" to do so.  (*Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267, 275.)  This is one such case.  The gravamen of Arges's breach of contract cause of action is that LPL, without having investigated the merits of the *Romero* litigation, disclosed the *Romero* litigation to FINRA.  Because Arges's breach of contract cause of action, like his other causes of action, arises from LPL's disclosure of

---

10    In *Tilkey*, a FINRA firm terminated an employee based on his arrest for a domestic violence offense and then filed a Form U-5 reporting the reason for the termination.  (*Tilkey*, *supra*, 56 Cal.App.5th at p. 543.)  On appeal from a judgment in favor of the employee, we concluded the firm's filing of the Form U-5 was not absolutely privileged.  (*Id.* at p. 549.)  However, we reached that conclusion only because the Form U-5 in *Tilkey*, unlike the Form U-5 that LPL filed in the present case, lacked "allegations of improper securities conduct, theft, or allegations or charges of fraud or dishonesty." (*Id.* at p. 547; see *id.* at p. 549 ["[T]he statement in [the Form U-5] did not relate to [the employee's] business activities or any violation of FINRA Rules and was therefore not protected by an absolute privilege."].)

11    Because we conclude LPL's disclosure was absolutely privileged, we do not address whether it was independently entitled to a conditional (or qualified) privilege under Civil Code section 47, subdivision (c).

the *Romero* litigation to FINRA, we conclude application of the official proceeding privilege furthers the policies underpinning the privilege.

Fourth, Arges contends, without support or analysis, that the official proceeding privilege does not apply to his request for an order of declaratory relief expunging the *Romero* litigation from his CRD records and BrokerCheck. Arges misunderstands the nature of declaratory relief. Declaratory relief is an equitable remedy, not a standalone cause of action. (*Faunce v. Cate* (2013) 222 Cal.App.4th 166, 173.) Arges's expungement request thus stands or falls with the causes of action he alleges in the complaint. For the reasons previously stated, the trial court correctly determined those causes of action should be stricken. Therefore, the court did not err in striking Arges's related request for declaratory relief.

Because the challenged action falls within the official proceeding privilege and Arges failed to satisfy his second-step anti-SLAPP burden, the trial court correctly struck Arges's complaint. (§ 425.16, subd. (b)(1).)

IV

DISPOSITION

The order is affirmed. LPL is entitled to recover its fees and costs on appeal, in an amount to be determined by the trial court. (§ 425.16, subd. (c); *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 946.)

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

IRION, J.

20